[No. C016667. Third Dist. Mar. 29, 1995.]

B. C. COTTON, INC., et al., Plaintiffs and Appellants, v.
HENRY J. VOSS, as Secretary, etc., al., Defendants and Appellants.

## COUNSEL

Brian C. Leighton for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter E. Wunderlich, Assistant Attorney General, Richard Thalhammer and Deborah L. Barnes, Deputy Attorneys General, for Defendants and Appellants.

## OPINION

**SPARKS, Acting P. J.**—In this appeal and cross-appeal we consider challenges to the statutory and regulatory scheme establishing and governing the San Joaquin Valley Quality Cotton District (the district). (Food & Agr. Code, § 52851 et seq.)[1] The challenging plaintiffs are growers and breeders of cotton and the defendants are the director of the Department of Food and Agriculture, the San Joaquin Valley Cotton Board and the State of California. The trial court found that one portion of the statutory scheme, section 52856, was unconstitutionally vague but otherwise rejected plaintiffs' challenges to the law. We agree with the trial court that section 52856 cannot be applied as urged by the defendants, but reach that conclusion through

---

[1]The statutes applicable to the district are currently located in chapter 4 of division 18 of the Food and Agricultural Code, commencing with section 52851. Hereafter for purposes of clarity and convenience we will refer to the current legislation governing the district as chapter 4, and unless otherwise specified, section references will be to the Food and Agricultural Code.

principles of statutory interpretation and therefore reject the conclusion that the statute, as properly interpreted, is unconstitutional. We further conclude that the plaintiffs are not required to obtain permission from the defendants to engage in research activities with respect to nonapproved cotton varieties, but otherwise we reject all of plaintiffs' challenges to the statutory and regulatory scheme. We shall remand to the trial court for the issuance of judgment in conformance with the views expressed in this opinion.

## History of the Case

*Legal Background*

Cotton is a seed-hair fiber produced by a variety of plants of the genus *Gossypium*. (3 The New Encyclopaedia Britannica (15th ed. 1989) pp. 670-671.) The fibers grow from the outer skin of seeds within a seedpod or cotton boll. The fibers become tightly packed and upon maturity the boll bursts open releasing soft masses of fibers. A cotton crop is harvested when the bolls open and the fibers, referred to as lint, are separated from the seeds in a mechanical process called ginning. (*Ibid.*) When a crop is grown for cottonseed, the seeds are subjected to a process known as delinting to remove short fibers. (§ 52866.)

Cotton, which the industry markets as "the fabric of our lives," has been defined by Congress as "the basic natural fiber of the Nation" (7 U.S.C. § 2101), and has been described by our Legislature as the "state's number one field crop" (§ 6001). It "is plentiful and economically produced, making cotton products relatively inexpensive. The fibres can be made into a wide variety of fabrics ranging from lightweight voiles and laces to heavy sailcloths and thickpiled velveteens, suitable for a great variety of wearing apparel, home furnishings, and industrial uses. Cotton fabrics can be extremely durable and resistant to abrasion. Cotton is usually washable and can be ironed at relatively high temperatures. It is comfortable to wear because it absorbs and releases moisture quickly. When warmth is desired, it can be napped, a process giving the fabric a downy surface. Various finishing processes have been developed to make cotton resistant to stains, water, and mildew; to increase resistance to wrinkling, thus reducing or eliminating the need for ironing; and to reduce shrinkage in laundering to not more than 1 percent. Nonwoven cotton, made by fusing or bonding the fibres together, is useful for making disposable products to be used as towels, polishing cloths, tea bags, tablecloths, bandages, and disposable uniforms and sheets for hospital and other medical uses." (3 The New Encyclopaedia Britannica, *supra*, p. 671.)

For all its virtues, "[c]otton is not, however, a simple, fungible commodity." (10 Harl, Agricultural Law (Feb. 1991 supp.) § 79.01[1].) In general,

there are three broad groups into which cotton may be classified, based upon the average length of the fibers comprising a sample, referred to as the staple length.[2] (10 Harl, *supra*, § 79.01[1]; 3 The New Encyclopaedia Britannica, *supra*, p. 671.) However, "[n]ot only are there different kinds of cotton, but each kind is subject to considerable variation that affects grade, quality, industrial usefulness, and market price." (10 Harl, *supra*, § 79.01[1], fn. omitted.)

Prior to governmental intervention, the numerous cotton variations created marketing problems. Although various markets and exchanges employed the same or similar terminology in describing cotton variations, the terms lacked definitional uniformity. This created uncertainty and instability in commercial trading from the futures markets through spot market sales by producers, who complained that their crops were being systematically underpriced as a hedge against uncertainty. (10 Harl, Agricultural Law, *supra*, §§ 79.01[1], 79.02[1].) Various private and administrative efforts to establish a uniform system of classification proved unsuccessful. (*Ibid.*) Ultimately Congress succeeded in establishing such a uniform system through enactment of the United States Cotton Futures Act of 1914, reenacted 1916, and, in 1923, of the United States Cotton Standards Act. (7 U.S.C. §§ 15b, 51 et seq.)

Regulation of the cotton industry in this state took a different course, although it is also of long-standing duration. In 1925 the Legislature enacted an uncodified act to provide for the growing of one variety or species of cotton, Acala, in certain defined districts. (Stats. 1925, ch. 299, pp. 492-494.) In section 1 of the act the Legislature declared its purpose and the reasons necessitating the creation of one-cotton districts.[3] It then created 9 one-cotton districts, consisting of the counties of Riverside, Kern, Madera,

---

[2]"The first group includes the fine, lustrous fibres with staple length ranging from about 2.5 to 6.5 cm (1 to 2.5 inches) and includes types of the highest quality—such as Sea Island, Egyptian, and pima cotton. . . . The second group contains the standard medium-staple cotton, such as American Upland, with staple length from about 1.3 to 3.3 cm (0.5 to 1.3 inches). The third group includes the short-staple, coarse cottons, ranging from about 1 to 2.5 cm (0.375 to inch) in length, used to make carpets and blankets, to make coarse and inexpensive fabrics, and in blends with other fibres." (3 The New Encyclopaedia Britannica, *supra*, p. 671.)

[3]Section 1 of the 1925 act provides: "The legislature hereby declares that the purposes of this act are to promote, encourage, aid, and protect the planting and growing of cotton in the State of California; that it believes this purpose best can be accomplished by restricting within certain areas hereafter defined the planting and growing of but one variety or species of cotton, to wit: 'Acala'; that by this means alone is it possible to bring the cotton growing industry in the state to its highest possible development and to insure the growing of the most superior and economically most profitable variety or species of cotton; that the planting of pure seed is essential to the production of a more merchantable and better grade of cotton and cotton seed and for the production of a grade of fibre best suited for manufacturing purposes; that the planting of impure seed or plants other than that permitted in the areas hereinafter

Fresno, Kings, Tulare, Merced, Stanislaus, and San Joaquin, respectively. (Stats. 1925, ch. 299, § 7, p. 493.) Within those districts it was made unlawful to plant, pick, harvest, gin, or possess for planting seeds or plants of any cotton other than Acala. (Stats. 1925, ch. 299, §§ 3-6, p. 493.) The act was made inapplicable to the transportation, planting and growing of cotton seeds and cotton for experimental or technical purposes by the United States or the State of California, or to the transportation of cotton or cotton seeds through the districts. (Stats. 1925, ch. 299, § 10, pp. 493-494.) In 1933, when the Legislature enacted the Agricultural Code, the predecessor to the Food and Agricultural Code, the substantive provisions of the 1925 act were included as sections 951 to 954. (Stats. 1933, ch. 25, pp. 227-228.)

In 1961 the Legislature enacted urgency legislation with respect to one-cotton districts. (Stats. 1961, ch. 18, pp. 576-578.) By this enactment it added to the Agricultural Code, as section 950, the statement of purpose and intent from the 1925 act which had not been codified with enactment of the Agricultural Code.[4] It amended section 951 of the Agricultural Code to provide that Acala cotton "consists of the seeds or plants derived from the common seed stocks under the one variety breeding program at the United States Cotton Field Station, Shafter, California." Nonconforming cotton, cotton plants and cotton seeds were declared to be a public nuisance subject to seizure and destruction through a civil action to be maintained by the district attorney of the county wherein the nuisance existed upon relation of

---

defined is an economical harm and loss to the planter thereof and an irreparable injury to the adjoining or neighboring growers; that the restriction of the use to which cotton lands may be used, as provided in this act, is essential to the highest development of the cotton growing industry and of benefit even to one who would violate the provisions of this act; that it is essential that but one variety of cotton should be ginned in the districts in this act defined, otherwise the gin will mix the different kinds of seed, crossing takes place in the fields, the varieties are mongrelized, and cease to be uniform, the fibre deteriorates in quality, and the seed rendered unfit for planting; that solely by restricting the growing of one variety or species of cotton in certain areas can the fibre be grown of uniform length and quality, and the highest price paid for the cotton thus obtained, and the production of fibre of different lengths or grades be prevented; that fibres of different lengths and grades are commercially inferior and when assembled in one lot or grade are classed and given the value of the lowest grade in the lot or sample; that Acala cotton is now the variety or species of cotton that has been most highly developed and improved and most suited commercially for growing in the districts in this act defined; that if future experiments should develop an improved variety or species of cotton, this bill can be amended to designate it; and that the districts in this act defined can be altered, restricted or extended."

[4]The statement of purpose in the 1961 act followed the statement of purpose from the 1925 act, which we have set forth in footnote 3, *ante*, with the addition of the following paragraph: "Also, the improvement of planting cotton seed and cotton has been developed successfully through a co-ordinated program by federal, state and county co-operation in breeding and research in co-operation with the cotton industry in the San Joaquin Valley at the United States Cotton Field Station near Shafter, in Kern County, California, where Acala cotton seed and cotton has been under development for use and has been used in that valley."

the state director or the county commissioner. (Former Agr. Code, §§ 955-957, Stats. 1961, ch. 18, §§ 3-5, p. 577.) The state director and local commissioners under the supervision of the director were given the duty of enforcing the law. (Former Agr. Code, § 958, Stats. 1961, ch. 18, § 6, p. 577.)

In 1965 the Legislature amended section 954 of the Agricultural Code to provide: "This article does not apply to the planting, possessing for planting, growing, picking, harvesting or ginning of cotton by the United States Department of Agriculture or by the department, nor to the transportation of cottonseed through such districts from a point without the district to a destination without the district. The department may plant, grow, harvest, or gin cotton within such districts and designate other persons or agencies to do so for experimental purposes under the direct supervision of the department." (Stats. 1965, ch. 884, § 1, pp. 2491-2492.)

In 1967, the Legislature repealed and then reenacted the Agricultural Code. (Stats. 1967, ch. 15, p. 44 et seq.) The provisions with respect to one-variety cotton districts were rearranged and reenacted as sections 52851 to 52983. (Stats. 1967, ch. 15, § 2, pp. 591-594.) The only substantive change was the deletion of Riverside County, as district No. 1, from the coverage of the law. (Former Agr. Code, § 52921, Stats. 1967, ch. 15, § 2, p. 593.)

The statutory provisions were substantially revised in 1978.[5] (Stats. 1978, ch. 592, pp. 2019-2030.) Among other things, the Legislature ceased designating each cotton-producing county as a separate district and created a single one-variety cotton district comprised of all counties in the San Joaquin Valley where cotton is produced. (Stats. 1978, ch. 592, § 2, p. 2021.) It also created the Acala Cotton Board. (Stats. 1978, ch. 592, § 2, p. 2021.) The 1978 legislation forms the basis for the statutory and administrative scheme that currently prevails, although it was further revised in 1990. (Stats. 1990, ch. 730.) The primary purpose of the 1990 legislation was to add Pima cotton as a legislatively approved variety of cotton. (See § 52851.) As a result of this legislation, the names of the district and board were changed from the One-Variety Cotton District and the Acala Cotton Board to the San Joaquin Valley Quality Cotton District and the San Joaquin Valley Cotton Board. (§§ 52865, 52871.) Since we are concerned here with the statutory and regulatory scheme prevailing after the 1990 legislation, we will focus our discussion upon the post-1990 statutory provisions and will note, when relevant, where the current law differs from the 1978 scheme.

---

[5]In 1972 the Agricultural Code became the Food and Agricultural Code. (Stats. 1972, ch. 225, § 1, p. 468.)

Chapter 4 begins with declarations of the purpose and necessity for restrictions upon the production of cotton and the use of cotton lands in the San Joaquin Valley. Sections 52851 and 52852 restate the declarations that spawned the original legislative interest in the matter in 1925, namely, that restrictions on the varieties of cotton which may be grown in the San Joaquin Valley are necessary to prevent mixing, mongrelization, and general deterioration of the entire valley crop. (See fn. 3, *ante*.) In section 52854 the Legislature declares that the production and marketing of Acala and Pima cotton are affected with public interest and that the legislation is an exercise of the police power. Section 52855 provides antitrust exemptions for those who act in accordance with the legislation and the rules and regulations adopted pursuant to it. Although Acala and Pima cotton are the only statutorily approved cottons for growing in the valley, in section 52853: "The Legislature declares that the development of varieties or species of cotton which meet the desired quality of Acala or Pima cotton should be encouraged, if reasonable restrictions are imposed to prevent contamination and preserve integrity of the high quality cotton produced within the district." In the 1990 legislation the Legislature added a new provision, which has no predecessor under prior law, and that states: "The Legislature further declares that all cotton approved for planting in the district is for the benefit of the cotton growing industry and is not for the exclusive or limited use of any person." (§ 52856.) As we shall explain, it is this statute which plays a central role in the present dispute.

The Legislature established a tripartite regulatory scheme for carrying out its purposes. Regulation of the cotton industry in the San Joaquin Valley is accomplished through the participation of (1) the state Department of Food and Agriculture, its director, and county commissioners, (2) a regulatory board formerly known as the Acala Cotton Board and now known as the San Joaquin Valley Cotton Board, and (3) those involved in the San Joaquin Valley cotton industry through the power of election and referendum.

The director and county commissioners acting under his or her supervision are charged with the duty of enforcing and carrying out the provisions and requirements of the law. (§ 52961.) The director conducts and supervises elections and referendums (§§ 52873, 52891.1, subd. (b)); may require the board to correct or cease any activity that is not in the public interest or which is in violation of the statutory law (§ 52889); may bring an action for judicial relief in a court of competent jurisdiction (§ 52890); may grant permits which allow seedcotton grown outside the district to be ginned within the district (§ 52903); collects assessment fees and may set the fees at

a rate below that specified by statute (§§ 52941-52943);[6] and may bring a civil action, to be prosecuted by the district attorney of the applicable county, for the seizure and destruction as a nuisance of any noncomplying cotton, cotton plant, or cottonseed (§§ 52974-52976). The department is required to adopt regulations governing research with respect to nonapproved varieties of cotton and to maintain the integrity and prevent contamination of approved varieties; require notice regarding the location of test sites and of dates and procedures for planting, harvesting and ginning cotton; and establish a procedure for importing cottonseed into the district. (§ 52901.) County commissioners act to enforce the law under the supervision of the director and may direct the district attorney to prosecute an action to seize and destroy nonconforming cotton, cotton plants or cottonseed. (§§ 52961, 52974.)

The board is established in section 52871. It consists of ten cotton growers, six cotton industry members, a public member, and six nonvoting ex officio members.[7] The grower members are required to have a financial interest in producing, or causing to be produced, cotton for market. The industry members are required to have a financial interest in, or be employed by, a person or organization handling cotton for market. The public member may not have a direct financial interest in the cotton industry. (§ 52876.)

The powers and duties of the board include establishing Acala and Pima quality standards after consideration of such things as fiber length, strength, uniformity, micronaire, seed quality, productivity, resistance to disease, including verticillium wilt, and spinning characteristics; reviewing and approving for release and planting varieties which meet existing Acala or Pima standards but are superior in some respect; conducting or commissioning tests for cotton production and quality evaluation of nonapproved cotton prior to approval; conducting periodic referendums regarding continuation of the district and with respect to any proposed changes in the Acala or Pima quality standard; requiring all cotton varieties approved for release to contain the word "Acala" or "Pima" in labeling and all lint to be marketed as

---

[6]The operations of the board and enforcement of the law are financed through assessments upon those who reproduce, sell and distribute cottonseed for planting purposes in the district. (§§ 52941-52945.)

[7]The grower members are elected by cotton growers in the district with six representing each of the six significant cotton-producing counties in the district and four from the four largest cotton-producing counties in the district. (§ 52871, subd. (a).) The industry members are elected two each from and by cottonseed processing organizations involved in seed crushing operations, handlers of raw cotton fiber, and cotton ginning organizations. (§ 52871, subd. (b).) The public member is appointed by the director from a list submitted by the board. (§ 52871, subd. (c).) The ex officio members are appointed by the board, one each from the United States Department of Agriculture and the University of California, and two each from cotton planting seed delinting organizations and organizations involved in the reproduction, sale and distribution of cottonseed in the district. (§ 52871, subd. (d).)

"SJV Acala" or "SJV Pima"; and recommending to the director on all matters pertaining to the law. (§ 52891.) The board is permitted to determine by resolution issues that are in the best interest of the cotton industry in the district and shall authorize the conduct of referendums among all cotton growers in the district to vote upon issues concerning the district. (§ 52891.1.) The powers and duties of the board also include, among other things, the adoption of rules, regulations and orders for carrying out the provisions of the law and the exercise of powers and performance of duties of the board; the administration and enforcement of the law; the promotion of the sale of cotton; and the conduct of or contracting with others to conduct scientific research on the marketing and production of cotton. (§ 52892.)[8]

Cotton growers in the district have a right of referendum. A referendum on the continued operation of the law must be held whenever 5 percent or more of the cotton growers in the district sign a petition calling for such a referendum. (§ 52931.)[9] In such a referendum the continued operation of the law requires a favorable vote from either 65 percent of the cotton growers who vote and who represent a majority of the cotton-producing acreage among those who voted in the referendum, or a majority of those who voted and who represent at least 65 percent of the cotton-producing acreage among those who voted. (§ 52932.) In addition to the continued operation of the law, the board must submit to referendum any proposed changes in the quality standards for Acala and Pima cotton and may call for a referendum on any issue concerning the district. (§§ 52891, subd. (d), 52891.1, 52936-52938.)

A violation of chapter 4 is a misdemeanor and also renders the violator civilly liable for all damages occasioned or caused by the violation. (§ 52973.) Except for research in compliance with regulations of the department, "it is unlawful for any person to plant, possess for planting, pick, harvest, gin, or delint any cotton except those seeds or plants that are approved by the board for planting within the district." (§ 52972.) And "[a]ny seed cotton, cotton plant, or cottonseed which does not comply with the provisions of this chapter is a public nuisance and is subject to seizure on complaint of the director or commissioner to a court of competent jurisdiction in the area in which the seed cotton, cotton plant, or cottonseed is located." (§ 52974.)

---

[8] If the board elects to engage in promotion and research activities, those activities may be financed through an annual assessment on cotton growers in the district. (§§ 52951-52953.)

[9] The 1978 enactment required a referendum to be held not later than January 1, 1983, and thereafter once every four years provided at least 5 percent of the cotton growers in the district signed a petition calling for a referendum. (Stats. 1978, ch. 592, § 2, p. 2027.) The 1990 enactment requires a referendum to be held whenever 5 percent of the cotton growers in the district call for it.

The research exception for nonapproved varieties serves a well-established policy. The federal government has long engaged or participated in cotton research and in 1966 Congress enacted legislation to facilitate cotton research and promotion. (7 U.S.C. § 2101 et seq.) The state also has long engaged or cooperated in cotton research. (See former Agr. Code, § 950, Stats. 1961, ch. 18, § 1, pp. 576-577.) In the 1925 legislation the Legislature specifically made the act inapplicable to experimental and technical endeavors of the state and federal governments. (Stats. 1925, ch. 299, § 10, pp. 493-494.) In 1965 the Legislature acted to exempt the federal and state departments from coverage of the law and to specifically provide that the state department could engage in experimental activities and could designate other persons or agencies to do so under the department's direct supervision. (Stats. 1965, ch. 884, § 1, pp. 2491-2492.)

In the 1978 act the Legislature took steps to ensure that research and experimentation would continue. It declared that the development of other varieties or species of cotton should be encouraged, provided reasonable restrictions are imposed to prevent contamination and to preserve the integrity of approved varieties. (§ 52853.) It added an article to chapter 4 to deal with nonapproved variety research. Specifically, section 52901 now provides: "The planting, possessing for planting, growing, picking, harvesting, ginning of cotton, delinting of cottonseed, or sale of lint by anyone conducting research on nonapproved varieties shall be in compliance with regulations adopted by the department. The department shall also adopt regulations to accomplish the following purposes: [¶] (a) To maintain the integrity of approved Acala or Pima cotton and prevent contamination of those types of cotton. [¶] (b) To require that growers notify the department regarding the location of test sites and of the dates and procedures for planting, harvesting, and ginning of cotton. [¶] (c) To establish a procedure for importing cottonseed into the district." The director is given discretion to grant permits to allow seedcotton grown outside the district to be ginned within the district provided it meets the requirements of subdivision (c) of section 52901. (§ 52903.) Nonapproved varieties of cotton can be approved by the board for release and planting in the district provided they are submitted to the board for production and quality evaluation and tests, which must be conducted for a minimum of three years prior to approval and release. (§§ 52891, subds. (b), (c), 52902.)

The department has promulgated regulations governing breeding and research with respect to nonapproved cotton varieties. For this purpose the regulations distinguish between breeding programs, performance testing, and agronomic research. Title 3, California Code of Regulations, section 3810, governs nonapproved cotton breeding and provides: "(a) Locations. Each

applicant conducting a breeding program with nonapproved cotton within the District shall be restricted to planting the introductions of germ plasma or genetic material at no more than five (5) locations, totaling no more than one hundred (100) acres. Each planting shall be at least one-half (1/2) mile removed from any Acala or Pima planting cottonseed production area. [¶] (b) Application. Application for permission to conduct a breeding program shall be made annually in writing to the director on or before January 15 of each year to provide for Board review and comment as required by section 3820, article 5. A plot map detailing the specific location(s) including Township, Range, section, and acreage of said proposed breeding plot(s) shall be filed with the director by February 15 of each year, so that the director may determine that the proposed location(s) does not fall within the isolation area designated in section 3810(a)."

Title 3, California Code of Regulations, section 3811, governs nonapproved cotton performance testing and provides: "(a) Location. Nonapproved cotton, for which initial crosses or evaluation have been made in a breeding program within the District, may be performance tested by an applicant at no more than eight (8) locations for a total of not more than two hundred (200) acres. Each planting shall be at least one-half (1/2) mile removed from any Acala or Pima planting cottonseed production area. Any approved cotton acreage within the test location shall be included when computing the two hundred (200) acre limit. [¶] (b) Application. Applications for permission to conduct nonapproved cotton performance testing shall be in writing to the director annually on or before January 15 of each year to provide for Board review and comment as required by Section 3820, Article 5. A plot map detailing the specific location(s) including Township, Range, Section, and acreage of the proposed planting(s) shall be received by the department on or before February 15 of each year so that the director may determine that the proposed location(s) does not fall within the isolation area designated in Section 3811(a)."[10]

Agronomic research[11] is governed by title 3, California Code of Regulations, section 3815 (public agencies) and section 3816 (private parties). Private parties conducting agronomic research are limited to a maximum of 10 acres removed at least one-half mile from Acala or Pima planting cottonseed production areas, and must submit an application by January 15 and a plot map by February 15 of each year. (Cal. Code Regs., tit. 3,

---

[10]If a person wishes to evaluate a cotton variety which has not been developed or evaluated within the district, he or she must apply to the board for performance evaluation pursuant to section 52902. (Cal. Code Regs., tit. 3, § 3802.)

[11]Agronomy is "the branch of agriculture that deals with field-crop production and soil management." (Webster's Third New Internat. Dict. (1971) p. 44.)

§ 3816.) The director may waive the agronomic research limitations upon a finding of need or recommendation of the board, and in all cases may allow additional limited acreage for seed increase upon recommendation of the board. (Cal. Code Regs., tit. 3, § 3803.)

Title 3, California Code of Regulations, section 3820 provides: "The director, upon receipt of the annual application, will forward such application to the Board for review and comment. [¶] The Board may require the applicant to appear in person to present his or her nonapproved cotton testing program. [¶] The director, after Board review and comment, may approve the nonapproved cotton testing program proposed by the applicant." Title 3, California Code of Regulations, section 3830 provides: "The director shall refuse an application or revoke an authorization granted under these regulations, if: [¶] (a) The proposed location does not meet the isolation requirements under Sections 3810(a), 3811(a), and 3815(a) or 3816(a); [¶] (b) The applicant or his cooperators fail to comply with the regulations pertaining to this subchapter, or state or federal quarantines applicable to cotton. [¶] (c) After review and comment by the Board, the program proposed is determined not to be in the best interests of the cotton industry in the District."

*Procedural History*

The plaintiffs are B.C. Cotton, Inc., Harvey Campbell & Associates, Inc., F.E. Bird & Sons, David Ferguson & Associates, Ltd., and Jesse Cruz. They are growers and breeders of cotton who are engaged in the cotton industry in the San Joaquin Valley. In recent years they have discovered and/or developed a small but lucrative market for naturally colored cotton. Naturally colored cotton, as the name implies, is not white like most of the varieties of cotton produced, but is grown in the boll in various colors such as green, red and brown. Plaintiffs maintain that prospective purchasers of naturally colored cotton are aware of their own requirements and are willing to accept cotton that does not meet the same quality standards of San Joaquin Valley Pima and Acala cottons. Nevertheless, such purchasers are willing to pay a premium for naturally colored cotton and such cotton can be sold for a per-unit price many multiples of the price of Pima or Acala cotton.

Plaintiffs desire to produce naturally colored cotton in the San Joaquin Valley for a number of reasons, including the remarkably clement environment and the fact that they are residents of the valley and wish to operate in their home range. However, it appears that no naturally colored cotton has been approved for general release and growing in the San Joaquin Valley. In fact, it appears that the issue of naturally colored cotton is a recent one, and perhaps for this reason the statutory scheme does not specifically address

naturally colored cotton.[12] Nevertheless, it appears from the record that some of the concerns of the Legislature are exacerbated with respect to naturally colored cotton. For example, it appears that in the ginning process it is difficult, if not impossible, to prevent some mixing of cotton lint. While contamination of an Acala or Pima cotton crop by small amounts of nonapproved white cotton will not have a significant effect, due to visual contrast and an effect on cotton dyes even a small contamination by colored cotton can have a significant impact on the value of a white cotton crop. It also appears that it is virtually impossible to prevent some seed mixture during the ginning and delinting processes. When colored cotton plants, through seed mixture or some other means, invade a white cotton field they will not become apparent until the bolls open, at which time they must be removed by hand before harvest to prevent contamination of the ginned lint. In an effort to address these concerns the department adopted regulations which preclude nonapproved colored cotton from being ginned or delinted within the district except at a gin or delinting facility dedicated to nonapproved cotton. (Cal. Code Regs., tit. 3, §§ 3823.1, 3826.1.)

Plaintiffs assert that they are willing to abide by departmental rules to avoid contamination of white cotton crops by naturally colored cotton. For the 1993 crop year they each applied for permission to plant up to 100 acres of nonapproved colored cotton at up to 5 locations for breeding purposes. Two of the plaintiffs, Harvey Campbell & Associates, Inc., and F. E. Bird & Sons, each requested an additional 200 acres for performance testing of primarily nonapproved colored cotton. On January 26, 1993, the plaintiffs appeared before the board's Breeder Review Committee, composed of growers, marketers and ginners of approved varieties of white cotton. According to plaintiffs, the members of the committee said they did not want naturally colored cotton grown in the district and also indicated they would not approve plaintiffs' breeding and performance testing requests unless they would agree to allow everyone in the valley to grow their varieties upon approval by the board, a condition to which the plaintiffs would not agree. The committee recommended to the board that each of the plaintiffs be

---

[12]The board was required to establish Acala and Pima cotton standards based upon a list of factors which does not include natural color. (§ 52891, subd. (a).) Other varieties may be approved for release and planting provided they meet the existing Acala or Pima quality standard "but are superior in some meaningful respect, as determined by the board, and which is generally recognized by the cotton industry to be an essential factor in producing that cotton within the district, or significant area within the district." (§ 52891, subd. (b).) Plaintiffs maintain that naturally colored cotton is superior to approved Acala and Pima cottons because of the premium price for which it can be sold. However, it is premature to consider whether a premium price makes a variety of cotton superior within the meaning of section 52891, subdivision (b), since plaintiffs have not sought approval for any of their varieties and do not maintain that their varieties can otherwise meet existing quality standards.

limited to 10 acres at one location for their naturally colored cotton breeding programs.

The board adopted the committee's recommendations without change. The plaintiffs purported to appeal to the director from the board's decision. The director denied the purported appeal on the ground that the board's recommendation was not a final order and therefore was not appealable. The director then issued his decision on the applications. He granted plaintiff F.E. Bird and Sons a total of 50 acres for breeding nonapproved colored cotton and approved plaintiff David Ferguson & Associates, Ltd.'s, research related to drought tolerance on 1 additional acre. Plaintiffs' applications with respect to naturally colored cotton were otherwise denied. The director's construction of section 52856 is reflected in a letter dated February 25, 1993, to another applicant for research on nonapproved cotton. There the director took the position that "[t]he purpose of the breeding program and the performance testing program is to benefit the cotton-growing industry in the district and not for the exclusive or limited use of any one person. (Food and Agricultural Code section 52856; California Code of Regulations section 3830(c)). [¶] . . . You are therefore placed on notice that future applications may be denied unless they demonstrate an intent to enter your nonapproved colored cotton in the San Joaquin Valley Cotton Board three-year testing program and to make the seed *available* pursuant to Food and Agricultural Code section 52902."[13] (Italics added.)

In response to the director's actions on their applications, plaintiffs brought this action seeking injunctive and other relief, declaratory relief, and a writ of mandate. In their complaint plaintiffs asserted a variety of bases for judicial relief including: (1) the procedures employed by the board and the director denied plaintiffs due process of law in that they were not accorded a hearing by the director, notice of the information the director relied upon, or an opportunity to rebut or otherwise address that information; (2) the board and the director denied plaintiffs equal protection of the law in that in 1993 all applications for breeding and performance testing of nonapproved white cotton varieties were approved while plaintiffs' applications for breeding and performance testing of nonapproved naturally colored cotton were severely restricted and in most instances denied; (3) the process violates principles of substantive due process in that the board is comprised of persons who are financially interested in the white cotton industry and who

---

[13]Section 52902 provides: "Before any nonapproved cotton is approved by the board for release and planting in the district, it shall be submitted to the board for production and quality evaluation and tests. The director in consultation with the board and the University of California shall adopt procedures for testing nonapproved cotton varieties. Such variety tests shall be conducted for a minimum of three years prior to approval and release of the variety."

are competitors of the plaintiffs and the Legislature failed to provide sufficient guidance for the exercise of the board's delegated authority; (4) the director's decision violates statutory authority in that it fails to encourage the development of new varieties of cotton; and (5) the statutory scheme violates the Constitution in that (a) the exclusion of naturally colored cotton from the district is beyond the Legislature's authority under the police power and (b) the requirement that approved cotton be made generally available to all growers in the district is an uncompensated taking of private property.

The trial court rejected all of plaintiffs' arguments save one. With respect to the director and the board's claim that upon approval of a variety of cotton for release and planting the breeder of such cotton variety must make it available to all growers in the valley, the court found the statute (§ 52856) was unconstitutionally vague. Both sides appeal.

DISCUSSION

### I. Section 52856

As we have noted, section 52856 states: "The Legislature further declares that all cotton approved for planting in the district is for the benefit of the cotton growing industry and is not for the exclusive or limited use of any person." The board and the director have taken the position that section 52856 means that a breeder of cotton must make its variety available to any grower in the district that wishes to grow it. In response to plaintiffs' assertion that compelling them to divest themselves of the product of their efforts would be an unconstitutional taking of private property, the board and the director asserted that no taking occurs because the plaintiffs would be permitted to charge for their cottonseed. The court inquired whether a breeder could satisfy the obligation to make its variety available by providing it to a limited number of growers or by charging an exorbitant price for the seed, but the director and the board could not provide a definite answer other than to insist that the seed must be made available. The court found section 52856 unconstitutionally vague because it fails to provide sufficient guidance to the board, the director and interested breeders. The board and the director appeal, contending that plaintiffs lack standing to challenge the constitutionality of section 52856 because they have not yet submitted their varieties for board approval and that in any event section 52856 is constitutional.

We may quickly dispose of the standing issue. ■ Courts are created to resolve cases and controversies and not to render advisory opinions or resolve questions of purely academic interest. Accordingly, courts will not

consider issues tendered by a person whose rights and interests are not affected. But this does not mean that a person must actually suffer irreparable harm before he or she has standing to object to a statute or regulatory measure; rather, it is sufficient that the objecting party show actual or threatened injury from the enactment. (*Heckler* v. *Mathews* (1984) 465 U.S. 728, 738 [79 L.Ed.2d 646, 655, 104 S.Ct. 1387]; *Board of Education* v. *Allen* (1968) 392 U.S. 236, 241, fn. 5 [20 L.Ed.2d 1060, 1064, 88 S.Ct. 1923]; *People* v. *Perry* (1931) 212 Cal. 186, 193 [298 P. 19, 76 A.L.R. 1331].) Thus, "[p]laintiffs have standing to sue if they or someone they represent have either suffered or are threatened with an injury of sufficient magnitude to reasonably assure the relevant facts and issues will be adequately presented." (*City of Irvine* v. *Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 874 [30 Cal.Rptr.2d 797].)

■ Plaintiffs have established standing in two respects. First, the record and the statutory scheme reveal that the development of a new variety of cotton can be an extremely costly and time-consuming process. As the trial court noted, a person contemplating entering into such an endeavor would desire and is entitled to know whether any success achieved will be assumed into the public domain. That is a sufficient interest to establish standing to challenge the statutory and regulatory scheme and it is no answer to assert, as the board and director maintain, that the plaintiffs should be required to take their chances in obtaining a favorable decision only after expending the time and money required to develop a new variety of cotton. Second, it is clear from the record that the board and the director are currently applying their interpretation of section 52856 in considering plaintiffs' attempts to engage in breeding and performance evaluation programs and are restricting or rejecting plaintiffs' efforts at least in part because they refuse to agree to make their varieties available to all growers in the valley. That is an actual injury suffered by the plaintiffs which gives them standing to object to the board and the director's application of their interpretation of the law. Accordingly, we reject the claim that plaintiffs lack standing and therefore turn to the merits of the issue.

■ We understand the trial court's concern that section 52856 is unduly vague with respect to a requirement that a breeder of cotton make a new variety generally available to other growers in the valley. However, that vagueness arises not from an unconstitutional legislative pronouncement but because section 52856 does not say what the board and the director insist that it says.[14] The statutory scheme devised by the Legislature is relatively straightforward. In order to preserve the overall quality of the San Joaquin

---

[14]The trial court recognized this, and told counsel "but it doesn't say that." After counsel asserted that the board and the director had interpreted the statute to that effect, the court

Valley cotton crop the Legislature has decreed that, except for research and development purposes in accordance with departmental regulations, no cotton but an approved cotton may be grown in the district. The only legislatively approved cottons are Acala and Pima. The Legislature, however, has chosen to encourage the development of new varieties of cotton and has provided that new varieties that meet certain criteria may be approved by the board for release and planting in the district. In this respect it appears that the legislative declaration that approval of a new variety is for the benefit of the industry and not for the exclusive or limited use of any person simply means that it is the new variety of cotton that is approved and not any particular grower or breeder and accordingly that board approval of a variety under chapter 4, in itself, does not confer limited or exclusive rights upon any particular person.

It is a quantum leap to advance from a declaration that approval by the board does not confer exclusive or limited rights on a grower or breeder to the conclusion that a breeder is thereby stripped of whatever rights he or she may otherwise have with respect to a new variety. Whether a breeder may maintain control over a variety of cotton he or she develops implicates a broad variety of federal and state laws including patent law (35 U.S.C. §§ 161-164), the federal Plant Variety Protection Act (7 U.S.C. § 2321 et seq.), state and federal trademark and trade name acts (15 U.S.C. § 1051 et seq.; Bus. & Prof. Code, § 14200 et seq.), and the common law of trademarks and trade names (*Derringer* v. *Plate* (1865) 29 Cal. 292, 295). It may involve contractual obligations or the simple refusal of a grower or breeder to give or sell his or her seed or plants to other persons. Nothing in chapter 4 indicates a legislative intent to override or preempt these matters. Section 52855 provides an antitrust exemption from such laws as the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.), and other statutory or common laws against monopolies or combinations in restraint of trade. But neither section 52855 nor any other section in chapter 4 states or implies an exemption or exception to the laws we have just mentioned.

Leaving aside the question of the legal and constitutional validity of the result asserted by the board and the director, we note that if the Legislature had intended that result it could easily have chosen language more appropriate to that end. For example, it could have expressly said that the breeder of any approved cotton must make his or her cottonseed generally available to

deferred to their interpretation but found it unconstitutionally vague. As we shall explain, there has been no valid administrative interpretation to which the court may defer and thus the court's conclusion, with which we agree, that the statute does not say what the board and the director assert is sufficient in itself to entitle plaintiffs to declaratory relief.

other growers. It could have made general availability of cottonseed of new varieties a condition, or at least a criterion, governing the approval of new varieties. And since in chapter 4 the Legislature included an article dealing with seed distribution for new varieties which are in the public domain by virtue of their development by state or federal agencies (§§ 52921-52923),[15] if it intended new varieties developed by private parties to be assumed into the public domain it surely would have required allocation of cottonseed for distribution pursuant to that article. Moreover, since divesting successful cotton breeders of property rights they may otherwise obtain in new varieties implicates the just compensation provisions of the state and federal Constitutions,[16] we may not assume that the Legislature intended such a result from language ill-suited to that end. (*Hutnick* v. *United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 466 [253 Cal.Rptr. 236, 763 P.2d 1326] ["It is a familiar rule of construction that statutes should be interpreted in a manner which avoids constitutional difficulties."].)

For these reasons we conclude that the board and the director have misconstrued the meaning of section 52856 and thus pushed it beyond its scope. While approval of a new variety of cotton does not confer, and the board cannot purport to grant, a limited or exclusive right to a breeder of a new variety of cotton, approval does not serve to divest a breeder of whatever rights he or she may otherwise obtain in a new breed of cotton. In short, the law does not require a breeder to agree to make his or her cotton variety generally available to other growers as a condition of either engaging in research and breeding activities (§ 52901), or seeking board approval of a new variety (§§ 52891, subd. (b), 52902).

In reaching this conclusion we are aware, of course, that words do not always have absolute and constant referents and that the meaning of a particular group of words may vary with the context and the circumstances. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Pacific*

---

[15]All breeders seed for varieties developed by the United States Department of Agriculture or the University of California and approved for release and planting must be allocated to the Foundation Seed and Plant Materials Service (FSPMS) for expansion to foundation seed which must then be distributed to all qualified recipients. (§ 52921.) The FSPMS is required to develop criteria for identifying and allocating foundation seed to qualified recipients, enabling persons with no prior history of cottonseed distribution to obtain an initial allocation of foundation seed, and to divide available foundation seed when requests exceed available seed. (§§ 52921-52923.)

[16]The so called takings clause of the Fifth Amendment to the United States Constitution provides: ". . . nor shall private property be taken for public use without just compensation." Article I, section 19, of our state Constitution provides, among other things: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

*Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1141 [234 Cal.Rptr. 630].) ■ The interpretation of a regulatory statute is, in the first instance, the duty of an administrative agency charged with its enforcement. Although final responsibility for interpretation of the law rests with the courts, the construction of the law by an administrative agency charged with its enforcement is entitled to great weight. (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697]; *Mission Pak Co.* v. *State Bd. of Equalization* (1972) 23 Cal.App.3d 120, 125 [100 Cal.Rptr. 69].) However, here there is no administrative interpretation of section 52856 to which the courts must, nor even may, defer.

Under our law "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of the state agency" is a regulation subject to the procedures required for the adoption of regulations by the Administrative Procedure Act (APA). (Gov. Code, §§ 11342, subd. (g), formerly subd. (b), 11370.) A regulation must be within the scope of the authority conferred on the agency and must be adopted in accordance with standards prescribed by other provisions of law. (Gov. Code, § 11342.1.) To be valid a regulation that implements, interprets, makes specific or otherwise carries out the provisions of a statute must be consistent and not in conflict with the statute and must be reasonably necessary to effectuate the purpose of the statute. (Gov. Code, § 11342.2.) ■ And an administrative agency cannot engage in rulemaking, including interpreting and implementing a statute, through informal procedures such as oral announcements, internal memoranda, or written and oral correspondence with affected parties. (*City of San Marcos* v. *California Highway Com.* (1976) 60 Cal.App.3d 383, 403-410 [131 Cal.Rptr. 804].) Among other things, the failure to comply with formalities requisite to the adoption of regulations would deprive affected parties of the opportunity to participate in the formulation of rules, which is an important aspect of the exercise of quasi-legislative authority. (*Id.* at p. 409.)

■ During argument before the trial court, the court noted that section 52856 did not appear to say what the board and the director asserted and inquired where it had been thus interpreted by regulation. Counsel conceded that there had been no regulation or other formal administrative action interpreting the statute. Upon further inquiry counsel were unable to provide the court with any specificity as to what their interpretation of the statute meant or how it should be applied or enforced. This points to two reasons the statute cannot be applied in the manner urged by the board and the director.

First, the statute itself does not say what the board and the director claim it does and the board and the department have not, in the exercise of their expertise and in conformance with procedures required by law, adopted an interpretation of the statute to that effect. Second, even assuming the statute could be given the interpretation urged by the board and the director, that interpretation would be too vague and uncertain to be given effect in the absence of implementing regulations. This would not necessarily mean that the statute is unconstitutionally vague, since imprecision in a regulatory measure may in appropriate cases be cured by construction and application. (See *Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 765-769 [221 Cal.Rptr. 779, 710 P.2d 845]; *Franklin* v. *Leland Stanford Junior University* (1985) 172 Cal.App.3d 322, 348 [218 Cal.Rptr. 228].) But at a minimum it would mean that the statute could not be given effect in the absence of implementing regulations to make it, and the standards for compliance with it, sufficiently definite.

For these reasons we agree with the trial court that section 52856 may not be applied to the plaintiffs in the manner urged by the board and the director. The statute does not appear to have the meaning informally assigned to it by the board and the director, it has not been interpreted and implemented through an appropriate administrative rulemaking process, and the board and director may not give the statute a meaning that is not apparent from its terms and statutory setting by engaging in informal, ad hoc decisionmaking. We disagree with the trial court only with respect to its conclusion that section 52856 is unconstitutional. As we have interpreted it, we find no constitutional flaw in the statute. Accordingly, we will reverse the finding of unconstitutionality and will remand the matter to the trial court with directions to issue a judgment granting declaratory relief to the plaintiffs in accordance with the views we have expressed in this opinion.[17]

## II. *Chapter 4*

The essence of plaintiffs' remaining objections to chapter 4 are twofold. In the broad sense they object to any restrictions on their ability to grow

---

[17]Our decision is without prejudice to the construction and implementation of the statute through appropriate regulatory and administrative procedures. In the event regulations are adopted to interpret and implement the statute, then interested parties will have the opportunity to challenge such regulations on any appropriate ground, including consistency with the statute and the constitutionality of the implementation of the statute. Since the interpretation of a regulatory measure is in the first instance the responsibility of the administrative agency charged with its enforcement and since regulations have not been adopted to interpret and implement section 52856, it would be premature for the courts to consider whether that section may be in some manner susceptible to the interpretation urged by the board and the director.

naturally colored cotton in the San Joaquin Valley. In the more narrow and immediate sense, they object to restrictions upon their ability to engage in breeding and development programs in accordance with departmental regulations. We will address the narrow question first.

Departmental regulations with respect to breeding and development of nonapproved cotton require a breeder who is interested in conducting such a program to apply to the director for permission. (Cal. Code Regs., tit. 3, §§ 3810, subd. (b), 3811, subd. (b), 3815, subd. (b), 3816, subd. (b).) The application must be forwarded to the board for review and comment. (Cal. Code Regs., tit. 3, § 3820.) The board may require the applicant to appear in person to present his or her program, but neither the board nor the applicant are provided with any standards to be applied in the review and comment process. (*Ibid.*) Following board review and comment the director may deny an application for the failure to comply with departmental regulations, the violation of regulatory isolation requirements, or the violation of state or federal quarantines. (Cal. Code Regs., tit. 3, § 3830.) The director may also deny an application if the program is determined not to be in the best interests of the cotton industry in the district, but the regulations fail to specify any of the factors that determination may include. (*Ibid.*)

The plaintiffs assert that this process is constitutionally flawed in that it confers uncontrolled, unguided power upon the board and the director, and that the problem is exacerbated since the board is comprised of financially interested parties who may in fact be plaintiffs' competitors. (See *People* v. *Belous* (1969) 71 Cal.2d 954, 972-973 [80 Cal.Rptr. 354, 458 P.2d 194]; *State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 448 [254 P.2d 29]; *Allen* v. *California Board of Barber Examiners* (1972) 25 Cal.App.3d 1014, 1020 [102 Cal.Rptr. 368]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 12-13 [97 Cal.Rptr. 431].) They also assert that this process denies them procedural due process of law since they are not given notice of the standards to which they must conform, the adverse information they must address, an opportunity to address adverse information, or the right to a decision by an impartial decision maker setting forth the reasons for denial or restriction of their applications.

In addressing plaintiffs' contentions it is necessary to distinguish between the quasi-legislative and the quasi-judicial acts of an administrative agency. The distinction is found in the nature of the function performed; quasi-legislative acts involve the making of rules of general application while quasi-judicial acts involve the application of rules to specific facts and specific individuals. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 834-835 [27 Cal.Rptr. 19, 377 P.2d 83].) ■ The exercise of discretion to grant or

deny a license, permit or other type of application is a quasi-judicial function. (*Weiss* v. *State Board of Equalization* (1953) 40 Cal.2d 772, 775 [256 P.2d 1].) Accordingly, the due process principles applicable to a licensing action are those applicable to quasi-judicial determinations.

It is too well settled to require a citation of authority that the Legislature may confer quasi-judicial power on an administrative agency. However, the exercise of quasi-judicial power requires an impartial decision maker. (*American Motors Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983, 992 [138 Cal.Rptr. 594].)[18] And in establishing a licensing law the Legislature must provide at least minimal guidance for the exercise of authority. Consequently, it cannot confer upon an agency the unrestricted authority to grant or deny licenses. (*In re Porterfield* (1946) 28 Cal.2d 91, 110 [168 P.2d 706, 167 A.L.R. 675].) In addition, licensing procedures must satisfy at least minimal requirements of procedural due process. Procedural due process is a flexible concept that does not establish universally applicable procedures for the resolution of all types of issues. (*Cafeteria Workers* v. *McElroy* (1961) 367 U.S. 886, 894-895 [6 L.Ed.2d 1230, 1235-1236, 81 S.Ct. 1743].) And the process which is due may depend upon a variety of factors, including the nature of the interest involved, the nature of the proceeding, and the possible burden on that proceeding. (*Hannah* v. *Larche* (1960) 363 U.S. 420, 442 [4 L.Ed.2d 1307, 1321, 80 S.Ct. 1502].) But while the types of procedures which are sufficient are variable with the type of action, at a rock-bottom minimum due process requires some form of notice and an opportunity to respond. (*Groppi* v. *Leslie* (1972) 404 U.S. 496, 506 [30 L.Ed.2d 632, 640, 92 S.Ct. 582]; *Lambert* v. *California* (1957) 355 U.S. 225, 228 [2 L.Ed.2d 228, 231, 78 S.Ct. 240].)

 Plaintiffs' objections to the application process involved here are well taken. The regulations provide for review and comment by the board, which is comprised of financially interested parties, but provide no standards

---

[18]A delegation of quasi-legislative authority to a board or industry council must be distinguished from a delegation of quasi-judicial authority. It has been suggested that in some instances delegations of quasi-legislative authority to boards or councils which are comprised of industry representatives may be upheld provided the Legislature provides sufficiently specific guidance for the implementation of legislative policy. (See *State Board* v. *Thrift-D-Lux Cleaners, supra,* 40 Cal.2d at p. 448; *Allen* v. *California Board of Barber Examiners, supra,* 25 Cal.App.3d at p. 1020; *Bayside Timber Co.* v. *Board of Supervisors, supra,* 20 Cal.App.3d at p. 12.) But legislative attempts to confer quasi-judicial power upon interested parties have been condemned. (See *American Motors Sales Corp.* v. *New Motor Vehicle Bd., supra,* 69 Cal.App.3d at p. 992.) And this is true even where the legislation prohibits interested members from actually deciding issues if they are nonetheless permitted to participate, comment, and advise the decision maker. (*Nissan Motor Corp.* v. *New Motor Vehicle Bd.* (1984) 153 Cal.App.3d 109, 115 [202 Cal.Rptr. 1]; *Chevrolet Motor Division* v. *New Motor Vehicle Bd.* (1983) 146 Cal.App.3d 533, 541 [194 Cal.Rptr. 270].)

whatsoever for the board to consider and apply.[19] Following the board's review and comment, the director may decide to deny an application based only upon his unrestrained and unguided view of the best interests of the industry in the district. The regulations give applicants no information concerning the general factors to be considered and which must therefore be addressed, the applicants are given no form of notice of adverse information or viewpoints specific to their cases, and they are given no opportunity to respond to adverse information and viewpoints.

The plaintiffs attribute their woes to an unlawful delegation of authority by the Legislature, but they are closer to the mark when they recognize that "[t]he Director provided himself with the authority to refuse an application for non-approved cotton breeding or performance testing . . . ." The fault here lies not with the Legislature, but with the department by purporting to confer licensing authority on the director and the board when the Legislature did not delegate such authority to the department, the director, or the board.

In law there is a fundamental distinction between "registration" and "licensing." Registration entails the provision of information and the compilation of a list, roster or the like, while licensing is the giving of permission to do a particular thing or to exercise a particular privilege. (*Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 856-857 [76 Cal.Rptr. 642, 452 P.2d 930].) Regardless of the terminology employed, a regulatory scheme that contemplates a requirement for permissive authority to act is a licensing scheme. (*Ibid.*; *Blatz Brewing Co.* v. *Collins* (1945) 69 Cal.App.2d 639, 643 [160 P.2d 37].) While a registration requirement can be properly adopted as part of a regulatory scheme, a licensing requirement can be established by only the Legislature. (*Blatz Brewing Co.* v. *Collins, supra,* 69 Cal.App.2d at p. 643; see also *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 585 [203 P.2d 758]; *In re Potter* (1913) 164 Cal. 735, 739 [130 P. 721].) Accordingly, while the Legislature can establish a licensing scheme and delegate the administration of the scheme to an administrative agency, where the Legislature has not established a licensing requirement an administrative agency may not confer such licensing authority upon itself. (*Ibid.*) Such an

---

[19]It is no answer to assert, as the board and the director do, that an applicant's presentation to the board need not comply with minimal due process principles because the board only makes recommendations to the director, whose decision is final. First, it is established that the problem of a partial, interested adjudicatory body cannot be resolved simply by providing that interested members may only comment and advise without actually deciding the issue. (*Nissan Motor Corp.* v. *New Motor Vehicle Bd., supra,* 153 Cal.App.3d at p. 115; *Chevrolet Motor Division* v. *New Motor Vehicle Bd., supra,* 146 Cal.App.3d at p. 541.) Second, in the process involved here the closest approximation to an opportunity to respond which is accorded an applicant is the appearance before the board in the review and comment process. If that appearance is the applicant's only opportunity to respond then that procedure must meet minimal due process requirements if the regulatory scheme is to do so.

attempt by an administrative agency to enlarge the scope of the powers conferred upon it is unlawful and void. (*Ibid.* See also Gov. Code, §§ 11342.1, 11342.2; *California Sch. Employees Assn.* v. *Personnel Commission* (1970) 3 Cal.3d 139, 143-144 [89 Cal.Rptr. 620, 474 P.2d 436]; *First Industrial Loan Co.* v. *Daugherty* (1945) 26 Cal.2d 545, 550 [159 P.2d 921].)

█ In chapter 4 the Legislature did not confer permissive authority over breeding and research upon the department, the board, or the director. The Legislature declared that development of new varieties or species should be encouraged, provided reasonable restrictions are imposed to preserve the integrity and prevent contamination of approved varieties. (§ 52853.) The Legislature included an article (art. 5, §§ 52901-52903) dealing with nonapproved variety research. There it decreed that the activities of anyone conducting research on nonapproved varieties must be in compliance with regulations adopted by the department, and directed the department to adopt regulations to maintain the integrity and prevent contamination of approved varieties, to require growers to *notify* the department regarding the locations, dates, and procedures to be employed, and to establish a procedure for importing cottonseed into the district. (§ 52901.) Notification is consistent with a registration requirement, but neither section 52901, nor anything else in chapter 4, purports to give permissive licensing authority over research activities to the department, to the board, or to the director. Since the Legislature did not provide the department, board or director with permissive licensing authority over nonapproved variety research, the department's attempt to create a permissive licensing scheme is an attempt to enlarge the scope of authority conferred on the department and to that extent is void.[20]

Our conclusion that the department's regulations are void to the extent that they require a cotton breeder to apply and obtain the director's permission to engage in nonapproved cotton research, does not mean the entire

---

[20]The fact that the Legislature did not expressly confer a licensing or permitting power upon the department, the board or the director, is sufficient in itself to preclude the creation by the department of such an authority, since the Legislature may not, and has not purported to, delegate the power to enact licensing laws to administrative agencies. (See 11 Cal.Jur.3d, Business and Occupation Licenses, § 22, p. 110; compare with Bus. & Prof. Code, §§ 16000 et seq. [licensing by cities], 16100 et seq. [licensing by counties], 16200 et seq. [state licensing].) However, even if a delegation of such authority were permissible and could be implied, we would not find such a delegation here. From 1925 until 1965, the Legislature excepted only the state and federal governments from the ban on nonapproved cotton. (Pp. 937-938, *ante.*) In 1965 the Legislature gave the department the authority to designate other persons or agencies to conduct cotton research under the department's direct supervision. (P. 938, *ante.*) With the substantial revision of the law in 1978, the Legislature chose to encourage the development of different varieties of cotton, withdrew the department's permissive authority over cotton research, and provided only that the department may regulate cotton research. The absence of a licensing or permitting authority in the department, the board or the director in section 52901 is made even more conspicuous by the fact that in the same article, in section 52903, the Legislature did give the director permit authority over the ginning of seedcotton grown outside the district. In view of this history and the statutory

regulatory scheme is void. In fact, with that exception we find nothing arguably unlawful about the regulatory scheme. The department was directed to adopt regulations governing nonapproved cotton variety research in order to, among other things, maintain the integrity and prevent contamination of approved cotton. (§ 52901, subd. (a).) The acreage limitations and isolation requirements in the regulations appear reasonably calculated to accomplish that result and there is nothing in the record which would support judicial second-guessing of the department's application of its expertise in these respects. (*Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1015 [9 Cal.Rptr.2d 358, 831 P.2d 798]; *Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 832.) To the extent that the regulations require a breeder to notify the director of an intent to engage in nonapproved variety research, provide information concerning his or her program, and to provide a plot map specifying locations, the regulations are not only consistent with a regulatory power generally, they are consistent with specific legislative directives in this instance. (§ 52901, subd. (b).) Accordingly, we find invalidity in the regulatory scheme only to the extent it requires a breeder to obtain permission from the director to engage in breeding and research activities.[21]

Plaintiffs' remaining contentions require only brief discussion.[22] ■ They maintain that the Legislature has no power to prohibit the production of naturally colored cotton in the San Joaquin Valley. We disagree. We deal here with the exercise of the state's police power and the law of public nuisance. (§§ 52854, 52974.) The power of the state to abate a public nuisance through the exercise of the police power is well established and the

setting of section 52901, we could not imply a licensing or permitting authority from the power to regulate conferred by that section.

[21]Nothing in our conclusion prevents the director from questioning the bona fide nature of a breeder's activities. The law will not countenance the evasion of regulatory provisions by subterfuge. (See *Pratt* v. *Adams* (1964) 229 Cal.App.2d 602, 606 [40 Cal.Rptr. 505].) In the event the director concludes that a breeder or breeders are attempting to evade regulatory restrictions through subterfuge he may bring or cause to be brought an appropriate legal action to enforce the law and upon proof such a breeder or breeders may be subject to the civil and criminal penalties of the law. (§§ 52890, 52972-52974.)

[22]One of plaintiffs' causes of action, and one of their appellate contentions, is that principles of equal protection were violated when the director approved all applications for research with nonapproved white cotton while denying or restricting applications for research with nonapproved naturally colored cotton. This contention is directed solely at the decision of the director since, with the exception of regulations governing the ginning and delinting processes that plaintiffs do not challenge, neither the regulations nor the statutes distinguish between white and colored cotton. Since we have concluded that the department, director and board do not have permissive licensing authority over nonapproved cotton research this contention is moot. However, we note that the main thrust of plaintiffs' appeal is not that they must be treated the same as breeders of nonapproved white cotton, but that they must be treated differently, which is hardly an equal protection perspective.

proper exercise of such power will not be considered a compensable taking of private property. (*Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. __ [120 L.Ed.2d 798, 821, 112 S.Ct. 2886].) This is true even where the exercise of the police power prohibits all economically beneficial use of the land. (*Ibid.*) In considering the propriety of the Legislature's exercise of the police power we, as a court, may not impose our view of the wisdom of the measure but must defer to the legislative judgment unless the measure is arbitrary and unreasonable. (*Ferguson* v. *Skrupa* (1963) 372 U.S. 726, 730 [10 L.Ed.2d 93, 97, 83 S.Ct. 1028]; *Sandstrom* v. *Cal. Horse Racing Board* (1948) 31 Cal.2d 401, 407 [189 P.2d 17].)

In support of their contention the plaintiffs argue that the production of naturally colored cotton is not a dangerous business and thus may be regulated but not prohibited. (See *Jardine* v. *City of Pasadena* (1926) 199 Cal. 64 [248 P 225, 48 A.L.R. 509]; *San Diego T. Assn.* v. *East San Diego* (1921) 186 Cal. 252, 254 [200 P 393, 17 A.L.R. 513]; *People* v. *Goodspeed* (1948) 85 Cal.App.2d Supp. 821, 826 [192 P.2d 130].) However, "[i]f an activity is inherently dangerous, or by reason of local conditions or the manner in which it is conducted it becomes harmful, and ordinary means of regulation are insufficient to overcome the evil, it may be wholly *prohibited*.*" (8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 789(2), p. 317, italics in original.) Thus, "[i]f, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the state thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless, looking through mere forms and at the substance of the matter, they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law." (*Booth* v. *Illinois* (1902) 184 U.S. 425, 429 [46 L.Ed. 623, 626, 22 S.Ct. 425].) Accordingly, in considering plaintiffs' argument we may not view their proposed activity in the abstract, but must consider the entire setting in which they propose to conduct their operations. In this respect we find the following factors significant:

(1) It appears from the record that in the San Joaquin Valley over a million acres are planted with approved cotton varieties. In fact, this production makes cotton the state's number one field crop. (§ 6001.) And the growers of approved varieties desire to conduct their operations free from contamination, mixing and mongrelization by nonapproved varieties.

(2) The Legislature has not left us to guess as to its reasoning but has specifically found that mixing, crossing, mongrelization and the deterioration of the entire valley crop would be inevitable from allowing nonapproved

varieties to be grown in the valley and that prohibition of nonapproved varieties is the sole means by which these evils may be avoided. (§§ 52851-52852.) Plaintiffs' assertion that these problems can be avoided through reasonable restrictions without prohibition upon nonapproved varieties is not self-apparent, is disputed by the director and the board, and is insufficient in itself to warrant judicial second-guessing of the Legislature's determination.

(3) Agriculture occupies a favored position in this state, and accordingly the Legislature has imposed severe limitations upon the ability of local governments, agencies, districts, private parties, and the courts, to declare or complain of agricultural practices under the law of public and private nuisance. (Civ. Code, § 3482.5.) Thus, unlike other types of activity that may come under police power scrutiny, if the Legislature does not prohibit plaintiffs' proposed activities, then other public and private persons and entities who are injured by those activities may find themselves without an adequate remedy.

(4) Under the statutory and administrative scheme established in chapter 4, any cotton approved for planting in the district is approved generally and cannot be approved on an exclusive or limited basis. (§ 52856.) And the Legislature has established no mechanism by which the department, the board, or the director can impose restrictions upon the planting, growing, harvesting, ginning, delinting, or other activities conducted with respect to approved cotton varieties. Accordingly, approval of naturally colored cotton varieties, whether through administrative procedures or by the courts, would place such varieties beyond the reach of the types of restrictions that even plaintiffs concede are necessary if approved white cotton varieties are to be protected.

Plaintiffs would argue, of course, that the Legislature should be compelled to amend the law to permit regulation rather than to prohibit the production of naturally colored cotton. However, such an alteration of the law would require comprehensive revision of chapter 4, and perhaps other statutory provisions relating to cotton in particular and agriculture in general. It would jettison a statutory scheme of long-standing duration that the Legislature has found to have served cotton growers and the people of this state well. And it would constitute rejection of the Legislature's finding that the current statutory scheme is the sole effective means of preserving the integrity of approved cotton varieties for the overall benefit of the district and of the public. Such matters are in the legislative rather than the judicial prerogative. As a court it is sufficient that we cannot say that the current statutory scheme is an arbitrary and unreasonable exercise of the police power.

Plaintiffs complain of the requirement that to become an approved variety their cottons must meet the existing Acala or Pima quality standard and be superior in some meaningful respect. (§ 52891, subd. (b).) They assert that their naturally colored cottons are superior in that they can be sold for a premium price, and argue that since their customers do not care whether they meet the Acala or Pima quality standard it is unreasonable to impose that requirement on them. We disagree. The value of an activity to one who would conduct it is a factor, but is not determinative with respect to the law of nuisance and the exercise of the police power. (See *Fairrington* v. *Dyke Water Co.* (1958) 50 Cal.2d 198, 200 [323 P.2d 1001]; *Anderson* v. *Souza* (1952) 38 Cal.2d 825, 840-841 [243 P.2d 497].) The Legislature is not compelled to permit plaintiffs to produce naturally colored cotton simply because that activity has value to them. And in considering the harm to be prevented we must focus, as did the Legislature, on the potential for injury to plaintiffs' neighbors rather than the desires of plaintiffs' customers. From the record it appears that naturally colored cotton does nothing to abate or ameliorate the danger to quality standards from contamination; rather, it appears that naturally colored cotton simply introduces a new dimension to the problem.

Plaintiffs complain that under chapter 4 the board is given authority to establish the Acala and Pima quality standards and to determine whether a new variety should be approved because it meets those standards and is superior in some meaningful respect. (§ 52891, subds. (a), (b).) We have noted that the Legislature can delegate authority to an administrative body provided the delegating statute establishes an ascertainable standard to guide the administrative body. (*State Board* v. *Thrift-D-Lux Cleaners, supra,* 40 Cal.2d at p. 448.) Here, the statute, not the board, establishes quality standards by reference to specific, established, approved varieties. The board's function is to measure and identify the quality standards of those varieties rather than to establish standards *ab initio*. And in performing this function the board must consider the specific quality factors set forth in the statute. We find the standard established by the statute to be sufficiently ascertainable that we cannot say the statute is invalid on its face. Plaintiffs lack standing to object further since they have not applied for approval of their varieties and do not claim that they have varieties which can meet existing Acala or Pima quality standards.

Plaintiffs object that the board is given authority to determine issues that are in the best interest of the cotton industry in the district. (§ 52891.1, subd. (a).) They argue that "best interests" is not a sufficiently definite standard to support delegation of authority to an administrative body, particularly one

comprised of interested persons. However, a statute will not be considered to be a delegation of legislative authority unless it empowers an agency or industry to initiate or enact rules that have the force of law. (*King* v. *Meese* (1987) 43 Cal.3d 1217, 1234 [240 Cal.Rptr. 829, 743 P.2d 889].) Under chapter 4 the obligations of individual cotton producers are straightforward: they can produce approved cotton varieties without restriction; they can engage in research with respect to nonapproved varieties in conformance with the department's regulations; and any other activities with respect to nonapproved varieties are prohibited. (§§ 52971-52976.) Chapter 4 does not otherwise interfere with the activities of individual producers and does not give the board regulatory authority over them. While we can imagine a number of issues the board may determine, such as whether to engage in cooperative research or marketing endeavors and whether to make recommendations to the department or the Legislature with respect to changes in the laws, we fail to perceive how the board is given the authority to initiate or enact rules with the force of law vis-à-vis the plaintiffs. Plaintiffs may challenge, in any appropriate manner, specific instances of the board's exercise of authority, but we do not find the law invalid on its face.

CONCLUSION

We have agreed with the trial court that section 52856 cannot be applied to the plaintiffs in the manner urged by the director and the board. Consequently, plaintiffs need not agree to make their varieties available to other producers as a condition of engaging in cotton research and development or of seeking approval for their varieties. However, we have reached this conclusion as a matter of statutory interpretation and have rejected the trial court's conclusion that section 52856 is unconstitutional.

We have further concluded that to the extent the regulations of the department require cotton breeders to obtain the director's permission, and give the director the permissive authority to grant or deny permission, for research and development of nonapproved varieties, those regulations usurp authority not granted by the Legislature to the department, the director, or the board, and hence are void. In this respect we have disagreed with the trial court and determined that plaintiffs are entitled to judicial relief.

In all other respects we have agreed with the trial court and have rejected plaintiffs' contentions challenging the statutory and regulatory scheme governing the San Joaquin Valley Quality Cotton District.

## DISPOSITION

The judgment is reversed and remanded to the trial court with directions to issue a new judgment consistent with the views expressed in this opinion. The parties shall bear their own costs on appeal.

Sims, J., and Nicholson, J., concurred.