[No. B080261. Second Dist., Div. Three. Dec. 21, 1995.]

UNITED FARM WORKERS OF AMERICA, AFL-CIO et al., Petitioners,
v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
CALIFORNIA TABLE GRAPE COMMISSION, Real Party in Interest.

[No. B081628. Second Dist., Div. Three. Dec. 21, 1995.]

CALIFORNIA TABLE GRAPE COMMISSION, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO et al., Real Parties
in Interest.

## COUNSEL

Marcos Camacho, Thomas Patrick Lynch, Mary Mecartney and Rees Lloyd, for Petitioners in No. B080261 and Real Parties in Interest in No. B081628.

Louise H. Renne, City Attorney (San Francisco), Jonathan V. Holtzman, Vicki A. Clayton, Deputy City Attorneys, as Amici Curiae on behalf of Petitioners in No. B080261 and Real Parties in Interest in No. B081628.

Morgan, Lewis & Bockius, Joseph E. Herman, Keith D. Grossman, Richard C. Rybicki and Craig E. Hunsaker for Petitioner in No. B081628 and Real Party in Interest in No. B080261.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV, Assistant Attorney General, and Douglas B. Noble, Deputy Attorney General, as Amici Curiae on behalf of Petitioner in No. B081628 and Real Party in Interest in No. B080261.

J. Antonio Barbosa, Susan P. Underwood and Julie Demaris for Respondent.

## OPINION

**KLEIN, P. J.**—Petitioners United Farm Workers of America, AFL-CIO (the UFW) and interveners Father Joseph Tobin (Father Tobin), Mytyl Glomboske (Glomboske) and Rudolph N. Rico (Rico) (collectively, interveners) seek review of a decision by respondent Agricultural Labor Relations Board (ALRB) finding the UFW had violated Labor Code section 1154, subdivision (d), by conducting an illegal secondary boycott and requiring the UFW to pay compensatory damages to persons injured thereby.

Petitioner California Table Grape Commission (Commission) also seeks review of the ALRB's decision insofar as it held the UFW did not violate Labor Code section 1154, subdivision (h).[1]

The essential issues presented are the authority of the Commission to file unfair labor practices charges with the ALRB and the ALRB's authority to award compensatory damages.[2]

Because the Commission was not empowered to file unfair labor practice charges with the ALRB, the decision of the ALRB shall be set aside. We also conclude that even assuming the matter were properly before the ALRB, its decision cannot stand because it lacks jurisdiction to award compensatory damages to persons injured in their business or property by unlawful secondary boycott activity.

FACTUAL AND PROCEDURAL BACKGROUND

UFW leaders were concerned about the effects of allegedly cancer-causing and birth defect-causing pesticides used in the production of California table grapes on the health of farm workers and their families. Because Vons Companies, Inc. (Vons) was the largest supermarket chain in Southern California and its subsidiary, Tianguis stores, specifically catered to the Southern California Hispanic community, the union selected Vons as a prime target of its antipesticide campaign.

---

[1]Labor Code section 1154 states in relevant part: "It shall be an unfair labor practice for a labor organization or its agents to do any of the following: [¶] . . . [¶] (d) To do either of the following: . . . ; or (ii) to threaten, coerce, or restrain any person; where . . . an object thereof is any of the following: [¶] . . . [¶] (2) Forcing or requiring any person to cease using, selling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees. Nothing contained in this paragraph shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing. [¶] . . . [¶] (h) To picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is either forcing or requiring an employer to recognize or bargain with the labor organization as a representative of his employees unless such labor organization is currently certified as the collective-bargaining representative of such employees."

All further statutory references are to the Labor Code, unless otherwise indicated.

[2]Amicus curiae briefs have been filed by the City and County of San Francisco (San Francisco) in support of the UFW and the interveners, and by the California Department of Food and Agriculture in support of the Commission. The record reflects San Francisco has been sued by the Commission for halting the sale of fresh grapes at Candlestick Park, a city-owned stadium.

In 1989, UFW supporters collected signatures from customers in Vons's parking lots on petitions supporting the UFW's efforts to eliminate pesticides from grapes and other food. That summer, UFW leaders presented Vons's management with petitions signed by 40,000 customers and requested Vons stop advertising and promoting table grapes. After a second meeting, Vons stopped selling table grapes in its Tianguis stores and in stores located in grape growing areas, and refrained from advertising and promoting grapes. However, after seven or eight weeks, Vons resumed selling and promoting table grapes. In June or July 1990, the UFW began sending supporters to individual stores to ask customers to boycott Vons and shop elsewhere. After eight months of such boycott activity, Vons filed unfair labor practice charges alleging the union was violating the secondary boycott provisions of the Agricultural Labor Relations Act (ALRA). (§ 1140 et seq.) A complaint issued, and the ALRB obtained a temporary restraining order prohibiting the UFW's picketing. UFW supporters Father Tobin and Glomboske defied the temporary restraining order and were arrested. A hearing on the alleged unfair labor practices was held in late 1990, but before a decision issued, Vons and the UFW reached a private party settlement in which Vons agreed to cease promoting and advertising table grapes.

In May 1991, the Commission notified Vons it intended to bring an antitrust action for injuries which the ban on table grape promotion was causing to its members. On May 31, 1991, Vons and the Commission entered into a settlement agreement whereby Vons consented to entry of a permanent injunction requiring it to promote and advertise table grapes and forbidding it from entering into contrary agreements with the UFW. When the UFW learned of the agreement, it announced it would resume its boycott with a mass demonstration at the Tianguis store in Montebello on June 6, 1991.

There were 32 incidents of boycott activity occurring between March 22, 1991 and December 8, 1991. Twenty-nine of the incidents took place at five different Tianguis stores, two at Vons stores, and one at Vons headquarters.

During a typical demonstration, several people wearing placards would stand on the sidewalk near the entrance to the market's parking lot. The placards bore messages such as "Don't Shop Here," "Boycott Grapes," "No Grapes," followed by the UFW logo. Demonstrators would approach cars as they entered the parking lot and hand the occupants leaflets asking people not to shop at Vons or Tianguis because they sold table grapes treated with pesticides harmful to farm workers, their families, and consumers in general. Leafletting also occurred as people parked their cars or approached the store

entrance. Some leafletters shouted slogans or chants such as "Boycott Tianguis," "Boycott Vons," "Don't Shop Here," or "No Uvas" (No Grapes). The leafletters often would engage customers in brief conversations to explain the UFW's position and ask people to shop elsewhere.

Representatives of groups other than the UFW participated in some of the 1991 demonstrations. When FOCUS (Families Opposed to Chemical Urban Spraying) volunteers learned Vons was working to oppose the "Big Green" ballot initiative, they joined in the picketing, as did Action Now, a group concerned with the use of pesticides in the production of foods. The Robin Hood Foundation, a civil rights group of which Rico was president, also took part in the 1991 demonstrations at Vons.

The Commission filed charges against the UFW with the ALRB, alleging the UFW had violated the secondary boycott provisions of the ALRA on numerous occasions in 1991 by picketing markets owned and operated by Vons.

After investigating the Commission's charges, the ALRB's general counsel issued a complaint [3] alleging 39 instances in which the UFW's picketing violated section 1154, subdivision (d)(ii)(2) by exerting improper secondary pressure on Vons so that it in turn would exert pressure on California's grape growers, all of whom were members of the Commission, to stop using certain pesticides on the table grapes they produced. The complaint subsequently was amended by adding 33 additional incidents and by alleging the UFW's conduct also violated the prohibition against recognitional picketing found in section 1154, subdivision (h) of the ALRA.

Following eight days of hearings, the administrative law judge (ALJ) ruled the UFW had violated subdivision (d) of section 1154 because: (1) the UFW's primary dispute was with the California table grape growers and not with Vons; (2) an object of the UFW's demonstrations was to force Vons to refrain from selling or otherwise dealing in California table grapes; (3) in carrying out its prohibited object, the UFW engaged in conduct which threatened, coerced or restrained Vons; and (4) neither the UFW's object nor its conduct was protected by section 1154, subdivision (d).

As for section 1154, subdivision (h), the ALJ found no violation because the object of the UFW's picketing at Vons was not to force an employer to recognize or bargain with the UFW.

---

[3]The general counsel of the ALRB has "final authority, on behalf of the [ALRB], with respect to the investigation of charges and issuance of complaints . . . and with respect to the prosecution of such complaints before the [ALRB]." (§ 1149.)

The UFW, the Commission and general counsel each filed timely exceptions to the ALJ's decision as well as supporting and reply briefs.

On November 5, 1993, after reviewing the record and the ALJ's decision in light of the exceptions and the briefs filed by the parties, the ALRB upheld the ALJ's determination the UFW violated section 1154, subdivision (d) on the occasions when it engaged in do-not-patronize picketing at Vons and Tianguis stores. (*United Farm Workers of America* v. *California Table Grape Com.* (Nov. 5, 1993) 19 ALRB No. 15.) The ALRB also affirmed the ALJ's conclusion the UFW did not violate section 1154, subdivision (h) because recognition of a union by employers was not the immediate goal of the picketing.

The order of the ALRB directed the UFW to "[c]ease and desist from threatening, coercing, or restraining Vons . . . or any other person with an object of forcing or requiring Vons . . . or any other person to cease using, selling, transporting, or otherwise dealing in California table grapes produced by growers for whom the UFW is not the certified bargaining representative, or to cease doing business, directly or indirectly, with California table grape growers for whom the UFW is not the certified bargaining representative."

In addition, the UFW was ordered to "[c]ompensate any person injured in his or her business or property by reason of the conduct found herein to be in violation of section 1154(d) of the [ALRA] which occurred at the stores of Vons" on 31 specified occasions.

On December 3, 1993, the UFW and interveners filed a petition for review in the Second Appellate District, asserting this court had jurisdiction in that the alleged unfair labor practice charges occurred in Los Angeles County. That same day, the Commission filed a petition for review in the Fifth Appellate District, asserting venue was proper there because the Commission resides and transacts business in Fresno County.

Thereafter, the Supreme Court transferred the Commission's petition to the Second Appellate District and the two petitions were consolidated. This court issued a writ of review.[4]

---

[4]Section 1160.8 states "[a]ny person aggrieved by the final order of the board granting or denying in whole or in part the relief sought may obtain a review of such order in the court of appeal having jurisdiction over the county wherein the unfair labor practice in question was alleged to have been engaged in, . . . ." (See also Cal. Rules of Court, rule 59(a).)

" 'Final order' means . . . an order of the board either dismissing a complaint . . . or directing a remedy for the unfair labor practices found. [Citation.]" (*United Farm Workers* v.

CONTENTS

The UFW contends: the Commission lacks *standing* to initiate and participate in the maintenance of this administrative prosecution; the ALRB is not authorized to hear and determine an award of compensatory damages against the UFW in favor of persons injured by UFW secondary boycott activity; and its conduct is constitutionally protected by the First Amendment.

The Commission argues: the ALRB erred in finding the UFW did not violate subdivision (h) of section 1154 because recognition of the union by employers was the immediate goal of the UFW's picketing and the UFW's demands could not be met without bargaining.

The interveners aver: the ALRB acted in violation of due process of law and of its own regulations in admonishing counsel; the admonition is part and parcel of a pattern of prejudicial conduct which denied a fair hearing; and the decision is "opaque and violates due process."

DISCUSSION

I. *The Commission was not empowered to file unfair labor practice charges with the ALRB.*

1. *Introduction.*

With respect to the threshold issue of the Commission's standing to file charges, the ALRB disposed of the UFW's objection by ruling the Commission's "[l]egislative mandate is to promote the sale of fresh grapes by advertising *and other means* (Food and Agr. Code, § 65572),[5] and thus it has a legitimate interest in the outcome of these proceedings." (*United Farm Workers of America* v. *California Table Grape Com., supra*, 19 ALRB No. 15, p. 6, italics added.)

---

*Agricultural Labor Relations Board* (1977) 74 Cal.App.3d 347, 349 [141 Cal.Rptr. 437]; accord, *Harry Carian Sales* v. *Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 229, fn. 13 [216 Cal.Rptr. 688, 703 P.2d 27].) Although the instant decision by the ALRB called for further proceedings to determine the amount of compensatory damages, it is appealable as a final order because it directed the remedies for the unfair labor practices found, namely, that the UFW cease and desist from certain conduct and that it pay compensatory damages to persons injured thereby.

[5]Actually, the statute provides the Commission's mandate is to promote the sale of fresh grapes "by advertising and other *similar* means." (Food & Agr. Code, § 65572, subd. (h), italics added.)

The UFW contends that ruling was error. The UFW asserts the Commission lacks standing to initiate and participate in the maintenance of this administrative prosecution and the ALRB exceeded its jurisdiction in allowing the prosecution of this administrative action. The UFW argues the Legislature expressly limited the Commission's power to "investigate and prosecute civilly violations of *this chapter*" (Food & Agr. Code, § 65572, subd. (g), italics added), a chapter within the Food and Agricultural Code, and the Commission therefore lacks standing to initiate proceedings under the ALRA, within the *Labor Code*.

A reasoned resolution of the issue requires an examination of the genesis and function of the Commission.

### 2. *Overview of the Commission.*

The Commission was created in 1967 by the Ketchum Act, which appears at chapter 3 of Division 22 of the Food and Agricultural Code. (Food & Agr. Code, §§ 65500-65675, 65502.) There are currently 27 chapters of division 22, each dealing with the promotion of a particular product, ranging from eggs to kiwi fruit, cut flowers to asparagus. Five of these chapters are devoted to various aspects of the grape industry. Winegrowers, wine, grape rootstock, winegrape growers, and table grapes are covered by chapters 12, 12.5, 12.6, 12.7, and 3, respectively.

The Ketchum Act recognizes that "[g]rapes produced in California for fresh human consumption comprise one of the major agricultural crops of California, and the production and marketing of such grapes affects the economy, welfare, standard of living and health of a large number of citizens residing in this state." (Food & Agr. Code, § 65500, subd. (a).) The Ketchum Act declares it "the policy of this state to aid producers of California fresh grapes in preventing economic waste in the marketing of their commodity, to develop more efficient and equitable methods in such marketing, and to aid such producers in restoring and maintaining their purchasing power at a more adequate, equitable and reasonable level." (Food & Agr. Code, § 65500, subd. (g).)

The Commission's mission is "[t]o promote the sale of fresh grapes by advertising and *other similar means* for the purpose of maintaining and expanding present markets and creating new and larger intrastate, interstate and foreign markets for fresh grapes; to educate and instruct the public with respect to fresh grapes; and the uses and time to use the several varieties, and

the healthful properties and dietetic value of fresh grapes." (Food & Agr. Code, § 65572, subd. (h), italics added.)[6]

The Commission is composed of twenty-two members: twenty-one fresh grape producer members (three from each of seven districts) and one public member. (Food & Agr. Code, §§ 65550, 65554.) To qualify to serve on the Commission, a producer member must be "an individual, partner or employee of a producer or producers, . . . actively engaged in growing fresh grapes within this state for a period of at least five years and . . . producing grapes subject to the provisions of [the Ketchum Act] at the time of the election" to the Commission. (Food & Agr. Code, § 65553.) The producer members are elected by the producers in their respective districts. (Food & Agr. Code, § 65556.) The lone public member is a Commission nominee, appointed by the Director of Food and Agriculture. (Food & Agr. Code, §§ 65550, 65575.1, 65528; see 31B West's Ann. Food & Agr. Code (1986 ed.) Historical Note foll. § 35, p. 20 [1972 amendment to § 35 changed name to "Director of Food and Agriculture" from "Director of Agriculture"].)

To fund the objectives of the Ketchum Act, the act authorizes an assessment on table grapes not to exceed $0.6522 per 100 pounds. (Food & Agr. Code, § 65600.) The assessments are paid to the Commission by the shippers, who are authorized to collect the assessments from the producers. (Food & Agr. Code, §§ 65604, 65605.) Shippers are required to keep

---

[6]With respect to the *duties* of the Commission, Food and Agricultural Code section 65572 further provides the following: "(i) In the discretion of the commission, to educate and instruct the wholesale and retail trade with respect to proper methods of handling and selling fresh grapes; to arrange for the performance of dealer service work providing display and other promotional materials; to make market surveys and analyses; and to present facts to and negotiate with state, federal and foreign agencies on matters which affect the marketing and distribution of fresh grapes; and to undertake *any other similar activities* which the commission may determine appropriate for the maintenance and expansion of present markets and the creation of new and larger markets for fresh grapes. [¶] (j) In the discretion of the commission, to make in the name of the commission contracts to render service in formulating and conducting plans and programs, and such other contracts or agreements as the commission may deem necessary for the promotion of the sale of fresh grapes. [¶] (k) In the discretion of the commission, to conduct, and contract with others to conduct, scientific research, including the study, analysis, dissemination and accumulation of information obtained from such research or elsewhere respecting the marketing and distribution of fresh grapes, the production, storage, refrigeration, inspection and transportation thereof, to develop and discover the dietetic value of fresh grapes and to develop and expand markets, and to improve cultural practices and product handling so that the various varieties may be placed in the hands of the ultimate consumer in the best possible condition. In connection with such research, the commission shall have the power to accept contributions of, or to match, private, state or federal funds that may be available for these purposes, and to employ or make contributions of funds to other persons or state or federal agencies conducting such research." (Italics added.)

complete and accurate records of all fresh grapes shipped by them. (Food & Agr. Code, § 65601.)

### 3. *The Commission's power to bring an action.*

Food and Agricultural Code section 65551 declares: "The California Table Grape Commission shall be and is hereby declared and created a corporate body. It shall have the power to sue and be sued, to contract and be contracted with, and to have and possess all of the powers of a corporation."

The right of the Commission to bring an action is set forth in Food and Agricultural Code section 65650, which states in relevant part: "The commission may, if it believes *a violation of this chapter* or any rule or regulation has occurred, or in the event of nonpayment of any assessment, bring an action in its name for collection of such assessment, civil penalties or for injunctive relief, including specific performance, of any obligation imposed *by this chapter* or any rule or regulation issued hereunder, or both, against any person violating any provisions *of this chapter* or any rule or regulation duly issued by the commission hereunder." (Italics added.)

Also pertinent here is Food and Agricultural Code section 65572, which states: "The powers and duties of the commission shall include the following: [¶] . . . [¶] (g) To investigate and prosecute civilly *violations of this chapter* and to file complaints with appropriate law enforcement agencies or officers for criminal violations of this chapter." (Italics added.)

█ The issue presented is whether, through these statutes, the Legislature has authorized the Commission to file charges with the ALRB alleging unfair labor practices pursuant to the ALRA, which is part of the Labor Code. (§ 1154.) The issue is pivotal because ". . . *an administrative agency created by statute is vested only with the powers expressly conferred by the Legislature and cannot exceed the powers granted to it.*" (*Healing* v. *California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1178 [27 Cal.Rptr.2d 758], italics added.) Thus, for example, "the [Coastal] Commission's powers and duties are only those vested in it by the Coastal Act." (*Ibid.*)

### a. *Principles of statutory interpretation.*

█ "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and

sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Further, although the ALRB's interpretation of the ALRA is entitled to "great weight" (*Harry Carian Sales* v. *Agricultural Labor Relations Bd.*, *supra*, 39 Cal.3d at p. 224), the "final meaning of a statute, . . . rests with the courts." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1389.)

   b.   *No contemplation by Legislature of any involvement by Commission in the area of labor relations.*

We begin by "consider[ing] . . . the statutory language in the context of the legislative purpose." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1387.)

As noted, the Legislature has declared the public policy underlying the Ketchum Act is "to aid producers of California fresh grapes in preventing economic waste in the marketing of their commodity, to develop more efficient and equitable methods in such marketing, and to aid such producers in restoring and maintaining their purchasing power at a more adequate, equitable and reasonable level." (Food & Agr. Code, § 65500, subd. (g).) In other words, the purpose of the Ketchum Act is to help promote California table grapes.

The legislative history of the Ketchum Act is straightforward and consistent with the above statement of policy.[7] It indicates the measure was sponsored by a group of table grape growers, for the "purpose of . . . improv[ing] and expand[ing] the market for fresh table grapes produced in California by research, advertising, and other promotional activities," with

---

[7]We have taken judicial notice of various legislative materials concerning the adoption of the Ketchum Act. (See *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 218, fn. 9 [185 Cal.Rptr. 270, 649 P.2d 912].)

funding for the Commission's program to come from an industry-wide assessment. (Assem. Bill No. 1736, Cal. Dept. of Agriculture, Enrolled Bill Analysis, Aug. 8, 1967.)

At the inception, it was recognized the Commission would "investigate and prosecute with the assistance of the Attorney General civil violations and file complaints for criminal violations of rules and regulations adopted pursuant to this bill." (Legislative Analyst's June 28, 1967, Analysis of Assem. Bill No. 1736, as amended in Assem., June 19, 1967.) ▮▮ However, there is nothing in the legislative history to show any contemplation of any involvement by the industry-controlled Commission in the area of labor relations, or of any enforcement role for the Commission outside the narrow area of the Ketchum Act.

   c.   *Usual rules of interpretation also support conclusion the Commission was not empowered to file charges with the ALRB.*

Moving beyond the legislative history, we scrutinize the pertinent statutes pursuant to the standard canons of interpretation.

The statutory construction doctrine of *expressio unius est exclusio alterius* means " 'the expression of certain things in a statute necessarily involves exclusion of other things not expressed[.]' " (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1391, fn. 13.) In *Dyna-Med, Inc.,* the issue was "whether the FEHA [California Fair Employment and Housing Act] grants the [Fair Employment and Housing Commission] authority to award punitive damages." (*Id.,* at p. 1385.) Its resolution turned on the interpretation of the following empowering phrase in Government Code section 12970: "and to take such action, *including, but not limited to,* hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization . . . ." (43 Cal.3d at p. 1385, italics added.)

The Supreme Court found that the express enumeration of hiring, reinstatement, upgrading, and restoration to membership, all of which were corrective, nonpunitive remedies, impliedly excluded the unexpressed remedy of punitive damages, which is different in kind from the enumerated remedies. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at pp. 1387-1391.)

By a parity of reasoning, the express enumeration in the Ketchum Act of the types of actions the Commission is authorized to bring impliedly excludes the Commission from involving itself in other types of proceedings.

The grant of power to the Commission "[t]o investigate and prosecute civilly violations *of this chapter* and to file complaints with appropriate law enforcement agencies or officers for criminal violations *of this chapter*" (Food & Agr. Code, § 65572, subd. (g), italics added) impliedly excludes the Commission from filing charges with the ALRB for violations of section 1154.

Also relevant here is the canon of interpretation requiring us to accord "significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.) An expansive interpretation of the Commission's power to sue or to file charges would render surplusage the narrow language of section 65572, subdivision (g) and section 65650.

Therefore, the general language of Food and Agricultural Code section 65551, declaring the Commission a corporate body and giving it the "power to sue and be sued, to contract and be contracted with, . . ." must be read in conjunction with sections 65572, subdivision (g), and 65650, under the rule that ". . . statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.) Food and Agricultural Code section 65572, subdivision (c), empowers the Commission "to do and perform all acts and exercise all powers . . . deemed reasonably necessary, . . . to effectuate the purposes of this chapter." Thus, in addition to the actions specified in Food and Agricultural Code sections 65572, subdivision (g), and 65650, the Commission could pursue suits arising out of its ability to establish offices, enter into contracts, hire employees, and so forth. (See, e.g., Food & Agr. Code, §§ 65572, subds. (d), (e), 65551.) However, the Commission's power to sue under Food and Agricultural Code section 65551 does not authorize it to file unfair labor practice charges with the ALRB for alleged violations of the Labor Code.

Examination of the remedies available to the Commission further confirms the Commission's lack of authority to file unfair labor practice charges. Under Food and Agricultural Code section 65650, relating to the Commission's right to bring an action, the remedies available to the Commission are "collection of such assessment, civil penalties or for injunctive relief, including specific performance, of any obligation imposed by this chapter or any rule or regulation issued hereunder, or both, against any person violating any provisions of this chapter or any rule or regulation duly issued by the commission hereunder." The relief sought here by the Commission clearly is outside the scope of these statutory limitations.

We are mindful the ALRA was not enacted until 1975. (Stats. 1975, Third Ex. Sess., ch. 1, § 2, p. 4013.) Therefore, the Ketchum Act, which was adopted in 1967, did not, and could not, address the Commission's authority to file unfair labor practice charges under the ALRA. However, the Legislature did not subsequently amend any of the pertinent provisions—Food and Agricultural Code sections 65551, 65572, subdivision (g), and 65650—in light of the ALRA, to enlarge the Commission's powers to include the filing of unfair labor practices charges with the ALRB.

Also telling here is the fact that other statutes of more recent vintage pertaining to marketing commissions track the narrow language of Food and Agricultural Code section 65572, subdivision (g). For example, the California Strawberry Commission, created in 1993, is authorized to "[i]nvestigate and prosecute civil violations *of this chapter* and file complaints with appropriate law enforcement agencies or officers for suspected criminal violations *of this chapter*." (Food & Agr. Code, § 77451, subd. (q), italics added; Stats. 1993, ch. 805, § 1.) Without belaboring the point, other statutes, including Food and Agriculture Code section 78263, pertaining to the California Asparagus Commission (Stats. 1990, ch. 1058, § 1, pp. 4400-4401), section 76298, relating to the California Sheep Commission (Stats. 1985, ch. 1102, § 1, p. 3717), section 76099, applying to the California Cherry Commission (Stats. 1984, ch. 1176, § 1, p. 4029), section 73169, dealing with the California Navel Orange Commission (Stats. 1983, ch. 494, § 1, p. 2005), and section 66585, subdivision (g), involving the California Iceberg Lettuce Commission (Stats. 1988, ch. 958, § 8, p. 3049), are all essentially identical. The fact the Legislature repeatedly has adhered to the narrow language it utilized in the Ketchum Act, even after the adoption of the ALRA, reflects the Legislature did not contemplate that a marketing commission, such as the Commission, would involve itself in agricultural labor disputes.

We conclude that nothing either in the language of the Ketchum Act or in its legislative history supports the claim the Legislature authorized the Commission to file unfair labor practice charges.

d. *The ALRB misinterpreted the Commission's mandate.*

As indicated, the ALRB based its determination the Commission was authorized to file unfair labor practices charges on the Commission's legislative mandate to "promote the sale of fresh grapes by advertising *and other means.*" (*United Farm Workers of America* v. *California Table Grape Com.*, *supra*, 19 ALRB No. 15, p. 6, italics added.)

In arriving at that conclusion, the ALRB rewrote the statute, misstating the Commission's authority. The Commission's actual mandate is "[t]o promote

the sale of fresh grapes by advertising *and other similar means . . . .*" (Food & Agr. Code, § 65572, subd. (h), italics added.) By no stretch of the imagination does the filing of an unfair labor practice charge constitute "other means" similar to advertising.

>   e. *The Commission cannot exceed the powers conferred upon it by the Legislature.*

The Commission, as a state agency,[8] has only those powers conferred on it by law. (*Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 391-392 [211 Cal.Rptr. 758, 696 P.2d 150]; *Ferdig* v. *State Personnel Bd.* (1969) 71 Cal.2d 96, 103 [77 Cal.Rptr. 224, 453 P.2d 728].)

*B. C. Cotton, Inc.* v. *Voss* (1995) 33 Cal.App.4th 929 [39 Cal.Rptr.2d 484], involving regulation of the cotton industry, is illustrative of the limits of agency power. The Department of Food and Agriculture issued regulations with respect to breeding and development of nonapproved cotton, requiring a cotton breeder interested in conducting such a program to apply to the director of the department for permission. (*Id.*, at p. 953.) In promulgating this requirement, the department "purport[ed] to confer *licensing authority* on the director and the [San Joaquin Valley Cotton B]oard, when the Legislature did not delegate such authority to the department, the director, or the board." (*Id.*, at p. 955, italics added.)

The reviewing court held the department's regulations invalid "to the extent that they require a cotton breeder to apply and obtain the director's permission to engage in nonapproved cotton research." (*B. C. Cotton, Inc.* v. *Voss, supra,* 33 Cal.App.4th at p. 956). It stated: "[W]hile the Legislature can establish a licensing scheme and delegate the administration of the scheme to an administrative agency, where the Legislature has not established a licensing requirement an administrative agency may not confer such licensing authority upon itself. [Citations.] *Such an attempt by an administrative agency to enlarge the scope of the powers conferred upon it is unlawful and void.* [Citations.]" (*Id.*, at pp. 955-956, italics added.)

---

[8]With respect to the status of the Commission as a state agency, the Legislative Analyst stated: "The commission is empowered to function as an agency independent of customary state government controls but it would exercise the authority of the state in promoting its purposes and objectives." (Legislative Analyst's June 28, 1967, analysis of Assem. Bill No. 1736, as amended June 19, 1967.) Similarly, the enrolled bill analysis by the California Department of Agriculture referred to the Commission as "a new quasi-State agency, outside of any existing Department or agency of government." (Cal. Dept. of Agriculture, Enrolled Bill Analysis, Assem. Bill No. 1736, Aug. 8, 1967.)

320

*B. C. Cotton, Inc.*, was well aware of the economic significance of the cotton crop, noting "in the San Joaquin Valley over a million acres are planted with approved cotton varieties. In fact, this production makes cotton the state's number one field crop. [Citation.] And the growers of approved varieties desire to conduct their operations free from contamination, mixing and mongrelization by nonapproved varieties." (*B. C. Cotton, Inc.* v. *Voss*, *supra*, 33 Cal.App.4th at p. 958.)

Although the department's imposition of a licensing requirement arguably would have protected the cotton industry, "the Legislature did not confer permissive authority over breeding and research upon the department, the board, or the director. The Legislature . . . decreed that the activities of anyone conducting research on nonapproved varieties must be in compliance with regulations adopted by the department, and [it] directed the department to adopt regulations *to maintain the integrity and prevent contamination of approved varieties*, . . ." (*B. C. Cotton, Inc.* v. *Voss*, *supra*, 33 Cal.App.4th at p. 956, italics added.) However, the statutory scheme did not go so far as "to give permissive licensing authority over research activities to the department, to the board, or to the director." (*Ibid.*)

Similarly, the Commission's attempt to enlarge the scope of the power conferred upon it by the Ketchum Act, in this instance by filing unfair labor practices charges against the UFW with the ALRB, likewise is unlawful and void.

Further, as shown in *B. C. Cotton, Inc.* the mere fact the agency's action might benefit growers generally is insufficient to legitimize the agency's conduct. Thus, although the Commission's filing of unfair labor practice charges could lead to increased consumption of table grapes by eliminating secondary boycott activity, that hoped-for result did not permit the Commission to file unfair labor practice charges without legislative authorization.

     f.   *Section 1140.4 of the ALRA cannot be utilized to confer standing on the Commission.*

     The ALRB argues the Commission had standing to file unfair labor practices charges because under the ALRB's regulations, "any person" may file an unfair labor practices charge. (Cal. Code Regs., tit. 8, § 20201.) "Person" is defined broadly in section 1140.4, subdivision (d), as including "individuals, corporations, . . . or any other legal entity, . . . *having an interest in the outcome of a proceeding under this part* [i.e., the ALRA]." (Italics added.)

The reliance of the Commission and the ALRB on said provision is misplaced. Irrespective of section 1140.4, the threshold issue is whether the

*Ketchum Act* authorizes the Commission to file an unfair labor practices charge. The Ketchum Act is controlling with respect to the Commission's power to proceed in this regard, and as explained above, the Ketchum Act does not authorize the Commission to file unfair labor practices charges with the ALRB. The ALRA's definition of "person" as one "having an interest in the outcome of a proceeding" (§ 1140.4, subd. (d)) does not operate to vest the Commission with any additional powers beyond those conferred upon it by the Ketchum Act.

By way of analogy, a person otherwise entitled to file unfair labor practices charges by virtue of having "an interest in the outcome of [the] proceeding" (§ 1140.4, subd. (d)) may be barred by ethical or other restrictions from filing such charges. (See, e.g. Rules Prof. Conduct, rules 3-300, 3-310.) Here, notwithstanding section 1140.4, the Ketchum Act precludes the Commission from filing unfair labor practices charges with the ALRB.

g. *Conclusion.*

Because the Ketchum Act does not authorize the Commission to file unfair labor practice charges with the ALRB, the ALRB erred in proceeding with the matter for lack of a proper charging party.

The plain language of the statutory scheme indicates the Legislature had a limited purpose in adopting the Ketchum Act. Were we to accord to the Commission the broad power it seeks, this case would set precedent for the numerous other industry-controlled marketing commissions to arrogate to themselves the right likewise to file unfair labor practices charges, based on similar statutory language, resulting in mischief not contemplated by the Legislature.[9]

If our interpretation is not what the Legislature intended, the statutory scheme could use clarification. (See *Malibu Committee for Incorporation* v. *Board of Supervisors* (1990) 222 Cal.App.3d 397, 410 [271 Cal.Rptr. 505], review den.; *Mir* v. *Charter Suburban Hospital* (1994) 27 Cal.App.4th 1471, 1487, fn. 7 [33 Cal.Rptr.2d 243], review den.)

---

[9]Although the Commission is not empowered to file charges with the ALRB, individual table grape powers who are affected by a union's unfair labor practices may do so as they would have an interest in the outcome of such proceedings. (§ 1140.4, subd. (d).)

II. *The ALRB is not authorized to award compensatory damages to persons harmed by secondary boycott activity.*

1. *The ALRB exceeded its statutory authority.*

█ Even assuming the matter were properly before the ALRB, its decision could not stand because the ALRB lacks authority to award compensatory damages to persons injured in their property or business by unlawful secondary boycott activity.

Section 1160.3 authorizes the ALRB, if it finds a person has engaged in an unfair labor practice, to "issue . . . an order requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, and making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, *and to provide such other relief as will effectuate the policies of this part.*" (Italics added.) It is this italicized language upon which the ALRB relies for its statutory authority to award compensatory damages. As explained below, the ALRB's reliance on said provision is misplaced.

To resolve the issue, we trace its development beginning with the ALRB's decision in *United Farm Workers of America, AFL-CIO (The Careau Group dba Egg City)* (1989) 15 ALRB No. 10 (hereafter, *Egg City*).

a. *The ALRB's expansive interpretation of section 1160.3 in Egg City.*

In *Egg City*, the ALRB ruled a compensatory damages remedy was available under the ALRA for illegal secondary boycott activity. *Egg City* held such a remedy should not be rejected simply because it was not specifically mentioned in section 1160.3, and it noted the California Supreme Court in *Harry Carian Sales* v. *Agricultural Labor Relations Bd., supra,* 39 Cal.3d 209, had determined the ALRB may impose a remedy reasonably necessary to effectuate the policies of the ALRA, even in the absence of specific statutory authorization.

In *Harry Carian Sales,* upon which the ALRB relied in *Egg City,* our Supreme Court held the ALRB "has authority to issue *remedial bargaining orders* in appropriate cases." (*Harry Carian Sales* v. *Agricultural Labor Relations Bd., supra,* 39 Cal.3d at p. 231, italics added.) The court reasoned, inter alia, the Legislature may have viewed express authorization as unnecessary because "section 1148 requires the [ALRB] to follow applicable

NLRA [National Labor Relations Act] precedent and bargaining orders were already well-established precedent under the NLRA." (*Ibid.*)

Based on the result in *Harry Carian Sales*, the *Egg City* decision reasoned the ALRB is authorized to award compensatory damages despite the lack of express statutory authorization because such a remedy was reasonably necessary to achieve the purposes of the ALRA.

b. *Supreme Court's Peralta decision held a statute substantially similar to section 1160.3 did not authorize an award of compensatory damages.*

In *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 44 [276 Cal.Rptr. 114, 801 P.2d 357], the Supreme Court was called upon to determine whether the Fair Employment and Housing Commission (FEHC) was authorized to award compensatory damages for unlawful employment discrimination.

The statute in issue there, Government Code section 12970, subdivision (a), which read much like section 1160.3, authorized the FEHC "on finding that a respondent employer or labor union has engaged in an unlawful discrimination practice, to issue an order requiring the respondent to cease and desist from the practice and 'to take such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization, as in the judgment of the [FEHC], *will effectuate the purposes of [the FEHA]* . . . .'" (*Peralta Community College Dist.* v. *Fair Employment & Housing Com., supra,* 52 Cal.3d at pp. 48-49, italics added, original italics deleted.)

The Supreme Court examined whether this provision allowing the FEHC to order the employer to take such action as the FEHC believed would effectuate the purposes of the FEHA, gave the FEHC statutory authority to award compensatory damages. (*Peralta Community College Dist.* v. *Fair Employment & Housing Com., supra,* 52 Cal.3d at p. 50.) *Peralta* observed "[u]nlike hiring, reinstatement, or upgrading, with or without backpay, and the other specified remedies, payment of compensatory damages arguably is not, in the common usage of the term, an *action* to be taken by the employer, nor, in any event, is payment of damages the *kind of specific and limited action* directed to elimination of discrimination and its effects in the workplace as the [FEHC] is otherwise empowered to require the employer to take." (*Ibid.*)

*Peralta* also applied the doctrine of *ejusdem generis,* which states " ' "where general words follow the enumeration of particular classes of

persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage. [Citations.]" ' " (*Peralta Community College Dist.* v. *Fair Employment & Housing Com.*, *supra*, 52 Cal.3d at p. 50.)

*Peralta* concluded "[i]n light of the foregoing, we are reluctant to infer that through the expansive language of [Government Code] section 12970 the Legislature intended by implication to grant the [FEHC] the authority . . . to award compensatory damages[.]" (*Peralta Community College Dist.* v. *Fair Employment & Housing Com.*, *supra*, 52 Cal.3d at p. 51.)

  c. *The ALRB in the instant case followed Egg City, notwithstanding the Peralta decision.*

The ALRB decided the instant matter in 1993, three years after *Peralta*. Adhering to its pre-*Peralta Egg City* decision, the ALRB in this case ruled that persons injured in their business or property by reason of the conduct found to be in violation of section 1154, subdivision (d), were entitled to recover compensatory damages.

The ALRB acknowledged the language of then Government Code section 12970, which was construed in *Peralta*, "contains some similarities to that of Labor Code section 1160.3." (*United Farm Workers of America* v. *California Table Grape Com.*, *supra*, 19 ALRB No. 15, p. 30.) However, it reasoned ". . . the language of section 1160.3 differs in that it does authorize damages in the form of bargaining makewhole.[10] Further, the ALRA, unlike the FEHA, does not provide for an alternative private action under which a superior court could award compensatory or punitive damages." (19 ALRB No. 15, p. 30.)

  d. *The ALRB's interpretation violates rules of statutory construction and cannot be reconciled with Peralta.*

The ALRB's interpretation of section 1160.3 is unsupportable. Pertinent here is the statutory construction principle of *ejusdem generis,* applied in *Peralta*, which construes general words following the enumeration of particular classes of persons or things, to be within the same general nature or

---

[10]The ALRA's make-whole remedy provides for "making *employees* whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain." (§ 1160.3, italics added; *Bertuccio* v. *Agricultural Labor Relations Bd.* (1988) 202 Cal.App.3d 1369, 1390 [249 Cal.Rptr. 473].)

class as the enumerated items. (*Peralta Community College Dist.* v. *Fair Employment & Housing Com., supra*, 52 Cal.3d at p. 50.) The enumeration in section 1160.3 of corrective remedies such as reinstatement, backpay, and employee make-whole, all of which are intended to benefit *employees,* undermines the ALRB's argument the statute's provision for "such other relief as will effectuate the policies of this part" authorizes an award of compensatory damages to persons injured in their property or business by a union's secondary boycott.

Further, the ALRB's claim it has broad authority to award compensatory damages would impermissibly render surplusage the specific provisions in section 1160.3 for backpay and employee make-whole. (See *Peralta Community College Dist.* v. *Fair Employment & Housing Com., supra*, 52 Cal.3d at p. 51.)

We note even the employee make-whole remedy has been carefully circumscribed by the Legislature. Section 1160.3 authorizes its make-whole remedy against employers but not labor organizations. (*William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd.* (1987) 191 Cal.App.3d 1195, 1214 [237 Cal.Rptr. 206]; *Maggio* v. *Agricultural Labor Relations Bd.* (1987) 194 Cal.App.3d 1329, 1333-1335 [240 Cal.Rptr. 195].) Given the statute's limitations with respect to the make-whole remedy, it is clear section 1160.3 does not confer upon the ALRB a broad authority to award compensatory damages.

As the Supreme Court observed in *Peralta,* the Legislature has demonstrated its ability to make clear its intent to grant the authority to award compensatory damages. (*Peralta Community College Dist.* v. *Fair Employment & Housing Com., supra*, 52 Cal.3d at pp. 50-51.) Therefore, we decline to infer the Legislature intended, by implication, in section 1160.3 to grant the ALRB the authority to award compensatory damages to persons injured in their business or property by reason of a union's unfair labor practices.[11]

> e.   *Our interpretation is consistent with federal law barring monetary awards other than back pay for unfair labor practices.*

The National Labor Relations Act (NLRA) contains a provision comparable to section 1160.3 The NLRA authorizes the NLRB to issue a cease and desist order and to require the violator "to take such affirmative action

---

[11]Our conclusion does not leave persons injured by a union's unfair labor practices without a remedy. Injunctive relief may be sought in the superior court pending the final adjudication of the ALRB with respect to a matter. (§ 1160.6.)

including reinstatement of employees with or without back pay, *as will effectuate the policies of this subchapter.*" (29 U.S.C. § 160(c), italics added.)

California's "statutory remedy was modeled on the federal remedy, so that the federal remedy is properly consulted to resolve uncertainties in the state statute. [Fn. omitted.]" (*William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd., supra,* 191 Cal.App.3d at p. 1205.)

Further, the ALRA, at section 1148, requires the ALRB to "follow applicable precedents of the National Labor Relations Act, as amended."

In *Peralta*, the Supreme Court noted that "federal courts, in interpreting the closely analogous remedy language of the [NLRA] (29 U.S.C. § 141 et seq.) relating to unfair labor practices, [fn. omitted], have uniformly held that *monetary awards other than back pay may not be awarded*[.]" (*Peralta Community College Dist.* v. *Fair Employment & Housing Com., supra,* 52 Cal.3d at p. 59, italics added.) The Supreme Court made this same observation previously in *Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at page 1397, stating "[f]ederal courts have continually interpreted the NLRA as not allowing monetary remedies other than back pay. [Citations.]"

Given the degree of similarity between section 1160.3 and its NLRA equivalent (29 U.S.C. § 160(c)), it is certainly appropriate to follow federal precedent on the issue of the ALRB's lack of authorization to award compensatory damages.

III.  *Other contentions not reached.*

Other contentions raised by the parties include whether the UFW's conduct is constitutionally protected by the First Amendment, and whether the ALRB erred in finding the UFW did not violate subdivision (h) of section 1154.

However, in view of our rulings herein, it is unnecessary to reach any of the remaining issues presented in the briefs.

DISPOSITION

Let a decree issue setting aside the ALRB's order in its entirety. (See § 1160.8; *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.*

(1981) 29 Cal.3d 721, 731 [175 Cal.Rptr. 626, 631 P.2d 60].) The UFW and interveners to recover costs on appeal.

Croskey, J., and Aldrich, J., concurred.

The petition of real party in interest California Table Grape Commision and respondent's petition for review by the Supreme Court were denied April 11, 1996. Baxter, J., did not participate therein.